270 N.J. Super. 596 (1994)
637 A.2d 928
BILLIE JANE MAUL, LIDA M. STELLA, ELAINE B. ZARYCRANSKI, DOROTHY B. KAUFMANN, HARRIET OSTERWEIS, THEODORE E. LAPRES, JR., AND FIRST FIDELITY BANK, N.A., AS CO-TRUSTEES UNDER THE WILLS OF THEODORE E. LAPRES AND MARIE T. LAPRES, AND THOMAS L. GLENN, JR., AND FIRST FIDELITY BANK, N.A., AS CO-TRUSTEES UNDER THE WILL OF THOMAS L. GLENN, SR., PLAINTIFFS-RESPONDENTS/CROSS-APPELLANTS,
v.
ELWOOD F. KIRKMAN, DANIEL BELL, JR., ALAN VOSS, HOWARD O. HURD, JR., AND CAROL K. TRIMBLE, ALL AS INDIVIDUALS AND AS DIRECTORS OF BOARDWALK SECURITIES CORPORATION, AND JOHN DOES WHO ARE OTHER DIRECTORS AND/OR OFFICERS OF BOARDWALK SECURITIES CORPORATION, DEFENDANTS-APPELLANTS/CROSS-RESPONDENTS, AND BOARDWALK SECURITIES CORPORATION, A NEW JERSEY CORPORATION, NOMINAL DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 4, 1993.
Decided February 2, 1994.
*600 Before Judges J.H. COLEMAN, MUIR, Jr., and LEVY.
Richard A. Grossman, argued the cause for appellants/cross-respondents (Grossman & Kruttschnitt, attorneys; Thomas J. Heavey and Mr. Grossman of Grossman & Kruttschnitt, and John T. Kelley of Saul, Ewing, Remick & Saul, on the brief).
George F. Kugler, Jr., argued the cause for respondents/cross-appellants (Archer & Greiner, attorneys; Ellis I. Medoway and Mr. Kugler, on the brief).
The opinion of the court was delivered by MUIR, Jr., J.A.D.
This case is a stockholder derivative action and a class action brought by minority stockholders against the president,[1] directors, and majority stockholders of the nominal defendant, Boardwalk Securities Corporation (BSC). In November 1987 plaintiffs filed their complaint in the Chancery Division of the Superior Court. They captioned it as a "Stockholders Derivative Action and Class Action" and alleged the officers and directors were guilty of breach of fiduciary duty, gross mismanagement, self-dealing, and fraud; and they sought various forms of relief which included compensatory damages, punitive damages, as well as removal of the directors or, in the alternative, dissolution of the corporation. After the trial court certified the case as a class action and the *601 requirements of R. 4:32-5 were met, the case proceeded to trial. On August 6, 1991, the trial court rendered an oral opinion that gave rise to the judgment under appeal. In its opinion, the trial court ordered:
(1) Defendant Elwood Kirkman, the president and a director of BSC, to pay
(a) to BSC $1,374,875 with prejudgment interest of $1,069,281 with the principal fund representing the total personal holding corporation taxes BSC paid from 1975 to 1990 rather than pay that amount in dividends to its investors (the trial judge "assumed" the money paid over less counsel fees would be distributed as dividends to the class members, but the judgment does not so provide);
(b) to BSC $300,910 with prejudgment interest of $153,031 with the principal amount representing excess compensation Kirkman received as president;
(c) to plaintiffs' counsel for legal fees and expenses incurred by the corporation in connection with the suit, fees of $244,543 with $30,336 prejudgment interest;
(d) to members of the class $250,000 in punitive damages with $45,000 in counsel fees.
(2) Defendant directors, Kirkman, Hurd, Bell, Voss, and Tremble, to pay to BSC all directors' fees paid to them from 1975 through 1990 with prejudgment interest.
(3) Defendant Kirkman to give all former BSC stockholders from whom he purchased stock, during the period 1975 to date of suit, the opportunity to repurchase the stock at the price initially paid with interest at rate set for prejudgment interest by court rules or, alternatively, for Kirkman to sell the stock to BSC on the same terms if the former stockholders do not purchase the stock.
(4) Plaintiffs' counsel to be paid $405,000 in fees out of the fund created by the $1,374,875 paid to BSC.
The judgment embodied the trial court rulings except as noted.
Defendants appeal. Plaintiffs cross-appeal. We affirm in part, reverse in part, and remand for further proceedings.

I.
BSC is a corporation formed in 1925 for the essential purpose of investment. At the times relevant, 1975 to 1990, it had 5,000 stock shares authorized with 309 shares in its treasury. Divided into voting and non-voting stock, the outstanding shares were 1,514 voting and 3,177 non-voting. Of the total outstanding, class members owned 2,127 or approximately 45%, while Kirkman *602 either owned, controlled, or had influence over the remaining shares of which 873 were voting stock.
From 1975 through 1988, Kirkman, or trusts under his control, acquired 393 shares of BSC stock from minority shareholders. The information of those shares is set out in the following chart:

Year Price
Acquired Transferor Transferee Per Share No. Share
1975 Mrs. Syd Fryle Trust 150 54
1975 Mrs. Syd Fryle Trust 100 100
1976 Paul Burgess Mary V. 100 10
 Kirkman
1977 Edith Dunn EFK(Kirkman) 100 11
1982 Virginia Maguinn EFK 150 1
1983 Bruce Dimon EFK 150 10
1985 Estate of Alvina EFK 210 3
 K. Bell
1986 Annabel Davis EFK 185 9
1986 Mrs. Max
 Gussman EFK 200 8
1987 Advest Inc. Trust 275 50
1987 Advest Inc. Trust 275 50
1987 Advest Inc. Trust 275 50
1988 Enoch Smith Trust 500 15
1988 Lois Smith Trust 500 15
1988 Raymond Smith Trust 500 7

Kirkman, an attorney admitted in 1926, began his association with BSC in a legal capacity. By the late 1920's he was a director. By 1940 he also served as BSC's president. During the same periods, he was a director and officer of a bank that after time, and several mergers, became part of First Fidelity Bancorporation. He also served as Chairman of the Board of Chelsea Title Company.
To the extent relevant, BSC bylaws, as amended, provide for four members of a board of directors which must meet four times a year. The bylaws also authorize an executive committee, composed of two directors appointed by the president, to have the power to invest corporate funds, to buy and sell securities in which the corporation had invested, to loan money of the corporation, *603 and to incur and pay bills. The bylaws further provide that, when dividends are earned and declared to be paid, they are to be payable semi-annually on June 30th and December 31st each year but that
Before payments of any dividends or making distribution of the profits there may be set aside out of the net profits of the company such sum or sums as the directors from time to time in their absolute discretion think proper as a reserve fund to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the company, or for any such other purpose as the directors shall think conducive to the interest of the company.
Decisions of Kirkman, implemented by the board of directors, led to imposition of substantial federal tax payments. Although BSC paid no regular corporate income tax for the years in question, 1975 to 1990, it paid substantial personal holding company (PHC) taxes due to the nature of its income, its retention of income, and concentration of its ownership. The tax inured as the result of BSC's holding undistributed income. The tax is imposed on the undistributed income which represents the corporation's adjusted taxable income less dividends paid to shareholders. See 26 U.S.C.A. § 541; Fulman v. United States, 434 U.S. 528, 531, 98 S.Ct. 841, 844, 55 L.Ed.2d 1, 7 (1978). A comparison of BSC income, with dividends and personal holding company tax paid for the years at issue, discloses:

 Pre-Tax Dividends PHC Tax
 Year Income Paid Incurred
 1975 $196,011 $ 29,318 $ 83,234
 1976 161,071 29,107 92,801
 1977 160,586 37,528 82,498
 1978 149,961 117,275 4,500
 1979 149,045 136,039 3,116
 1980 137,821 117,275 7,707
 1981 156,434 28,146 28,243
 1982 239,641 133,694 86,949
 1983 304,363 53,924 119,876
 1984 302,464 41,170 120,410
 1985 377,574 46,710 160,429
 1986 409,817 56,052 173,777
 1987 467,697 56,052 154,224
 1988 517,355 75,056 110,211
 1989 415,061 93,420 65,347
 1990 457,159 93,420 83,068

*604 Kirkman elected not to testify at trial to explain why BSC, under his direction, chose to pay the PHC tax rather than distribute its net annual income as dividends. Although present in court during the entire proceedings and although evidence disclosed he made controlling decisions for the corporation, Kirkman chose not to explain the rationale behind BSC decisions in paying PHC taxes in lieu of paying dividends or to explain the rationale behind other actions of the corporation.
Plaintiff offered defendant Daniel Bell's deposition, which gave his "rationale" for PHC tax payments in lieu of dividends. Bell stated:
I felt that we had to incur [PHC taxes] if we did not pay all the dividends out and in order to make adjustments in the company and pay debts. We had to have money to do it.
He said this despite a representation he could not recall any conversation before the board that BSC did not have sufficient funds to pay dividends rather than taxes. Neither Bell nor any other witness explained why BSC could not borrow funds if its cash flow was uneven to pay dividends until sufficient income was received or why BSC could not declare a dividend and delay payment until it had sufficient income collected. Kirkman's deposition, offered by plaintiffs, established BSC borrowed as much as $325,000 one year to purchase assets.
BSC stock purchases were a significant focus of proofs. The focus principally was on BSC's acquisition of First Fidelity Bancorporation stock. That focus related to plaintiffs' claim that Kirkman manipulated the BSC purchases of First Fidelity stock so Kirkman could enhance his influence on First Fidelity's board of directors and thereby personally gain from the acquisition.
BSC began purchasing the bank stock of First Fidelity's local predecessor shortly after Kirkman took over as BSC president. By 1975 BSC owned 1% of all Fidelity stock, or 127,706 shares. That represented 90% of BSC's investment. Even with the payment of the PHC taxes, BSC purchased a total of 50,000 shares of Fidelity between 1981 and 1987. The June 26, 1989, Notice of Annual Meeting of Shareholders of First Fidelity stated *605 Kirkman "beneficially owned" 459,292 shares. Of those shares, BSC owned 340,904 with the remainder either held as trustee for family members or personally owned by Kirkman. Defendant Howard Hurd testified that Kirkman made all the investment decisions for BSC and that the board of directors never overruled him.
As early as 1978, some of the plaintiffs, Glenn and Osterweis, through counsel sought information on BSC's holdings. In May 1978 counsel wrote Kirkman a letter requesting BSC's balance sheet and profit and loss statements for 1975 through 1977. Hurd, at Kirkman's direction, sent counsel asset and liability statements as of December 31, 1975, 1976, and 1977, and an income and expense statement for the same years (with PHC tax payment shown only for 1977).
Counsel then directed another letter to Hurd requesting access to federal income tax returns. The letter noted BSC "seem[ed] to be a PHC." It sought information on taxes paid in 1977, asked why no income taxes were paid in 1975 or 1976, and asked about an interest expense of $20,428 in 1975. Hurd gave a very terse but vague response. Other correspondence discloses counsel sought a meeting with Kirkman to express concerns about PHC tax payments, but Kirkman never agreed to the meeting.
Counsel for BSC, Kirkman's law firm, then got into the fray. That led to an exchange of letters that included challenges to and defense of the PHC tax payment. Interestingly, BSC dramatically increased dividends paid and dramatically reduced PHC taxes paid over the next three years.
The record discloses shareholders had little information about BSC's financial condition. A husband of a plaintiff wrote for information but received none. In addition, Hurd told him there was no market for the stock. Hurd did suggest that if the wife wanted to sell, Hurd might be able to find a buyer at less than or at the same price the wife inherited the stock. Other witnesses *606 described comparable incidences of being unable to gain information about BSC and its stock. One witness, head of the First Fidelity Trust Department from 1975 to 1987, attempted in 1984 to secure financial information on BSC. While talking to Hurd, the witness related his concerns and the need for BSC to provide the information. That witness quoted Hurd as saying he would try to secure the information but then added "you know [Kirkman] as well as I do. He'll give it to you if he wants to, but he won't if he doesn't want to."
Plaintiffs presented the testimony of two experts. One, a certified public accountant, opined that based on BSC's cash flow the corporation could have avoided the PHC tax by paying out dividends. He concluded that had the dividends been paid and had the stockholders invested them as BSC had done, the stockholders would have accumulated after tax earnings of $741,451.
Plaintiffs' other expert, a financial consultant, described the effect the BSC management policies had on the market value of company stock. In his view, not sending out financial information would kill the market value of the stock. He maintained the failure to give out financial information kept the fair market value of the stock depressed and supported his opinion by pointing out Kirkman was able to purchase BSC stock at $150 per share rather than true market value of $597 per share. He characterized Kirkman's purchases of minority shares over the years at a repressed price as "a gross abuse" of his knowledge of the true shares. He represented, if minority stockholders had no market for their shares, the only place they could go was the company itself. He further characterized the policy of paying PHC taxes rather than dividends as very detrimental to stockholders' best interests because BSC's purpose is to generate income.
When Kirkman chose not to testify, defendant Hurd testified for defendants. An officer and director from 1975, Hurd claimed BSC had a history of paying around two dollars a share as a yearly dividend during the early 1980s and, as the company grew, the *607 decision on the amount of dividends to be declared depended to a large extent on the company's cash flow. (This increased to three to four dollars a share per dividend period in some later years.) We note parenthetically the dividend payment pattern remained limited despite the fact the company grew from a market value of $3,000,000 to over $12,000,000 before later settling in at $10,000,000. Hurd claimed BSC had a restricted cash flow which effectively prevented payment of dividends. He noted that dividends and interest on bonds BSC invested in were received at "odd times" requiring BSC to either borrow money or sell off assets in order to pay the dividends.
According to Hurd, the reason all the income was not paid out in dividends was the need to retain money for investment and to pay company expenses. He gave no particularized examples, however. Hurd also asserted the company's indebtedness was repaid from income and from the sale of securities. He added that the impact of the PHC tax was considered by the directors in making their decision on the amount of dividends to be paid out. He denied that there was ever a policy of not paying dividends in order to depress the value of the company's stock or to defraud any of the stockholders. Hurd indicated that while most business decisions were made by the board, the board often relied on the suggestions of Kirkman based on his experience and judgment.

II.
The central focus of plaintiffs' claims was Kirkman's control of BSC to foster his own interests. Plaintiffs directed that focus on the corporate investment decisions; on significant recalcitrance to disclose BSC's financial condition, a recalcitrance that verged on total nondisclosure at times; on the policy behind awarding dividends; and on the policy to repeatedly pay substantial PHC taxes rather than declare dividends and save on the tax payments.
The trial court found plaintiffs' proofs persuasive and concluded Kirkman breached his fiduciary duties to the stockholders. Noting that the sole purpose of BSC was investment to produce *608 income for its investors and stockholders and that BSC's sole source of income was passive  income from investments  the trial court found
Mr. Kirkman ran [BSC] as he liked and as he wanted; that no one questioned his authority; that the board of directors was, during the period of time relevant to the claims before the Court, nothing more than a rubber stamp; that Mr. Kirkman made all of the investment decisions; that Mr. Kirkman made all of the dividend payment decisions; and that Mr. Kirkman made all of the decisions concerning the payment of taxes to the federal government; that in making those decisions in all three areas he ignored and disregarded the rights of the stockholders and made those decisions on what he perceived were his own best interests. And not only that, he operated the company in a secretive manner, denying legitimate requests for information from stockholders, and from the trust department of the very bank which he controlled. [A trust officer of Kirkman's bank, when asked about pressing Kirkman for information about BSC testified that "he pretty much ran it like he wanted, and that you didn't question whatever went on in that particular company."] In breaching his fiduciary relationship  his fiduciary responsibilities to the stockholders of the company, of [BSC], he is liable to them for compensatory damages....
The court found the fiduciary duty breach extended to the PHC taxes paid. It concluded, given the investment-income producing nature of BSC, BSC should have paid dividends and not taxes.
Thus, the court concluded that to promote his ability to be a consequent stockholder in First Fidelity Kirkman suppressed not only the payment of dividends but information on the expansively growing financial condition of BSC so he could control its operation. Effectively, that conclusion demonstrated that Kirkman tried to suppress the fair market value of BSC stock so outsiders would not take too much interest in BSC and concomitantly his management of it.
Those conclusions gave rise to the court's awards of damages and the judgment under appeal.

III.
We begin by affirming essentially for the reasons expressed by the trial court in its oral opinion except as hereafter noted. Our review of the record and applicable law satisfies us that, with the noted exceptions, there is sufficient credible evidence to support *609 the court's findings and conclusions. See Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484-85, 323 A.2d 495 (1974). As to those issues raised by appellant and cross-appellant but not reviewed, we conclude they are clearly without merit. See R. 2:11-3(e)(1)(A), (D). Finally, although many of the issues addressed relate solely to Kirkman's liability, because defendants appeal collectively we present them in that manner.

IV.
Defendant Kirkman sat in the courtroom during the entire trial but never testified. In its opinion the trial court stated
as a result of his failure to testify, I draw the adverse inferences that he could not refute the testimony of the plaintiffs, that he could not justify the investment policy of the corporation . .. that he could not justify the dividend policy, and that ... he could not justify the tax payment policy resulting in payment of approximately 1.2 million dollars in personal holding company taxes through the year 1988.
Defendants argue the trial court erred in drawing those inferences. They maintain that Kirkman's testimony would have been cumulative to Hurd's, that Kirkman was equally available as a witness to plaintiffs, and that Kirkman's testimony was unnecessary because plaintiff proffered substantial portions of pretrial discovery relating to Kirkman, including his deposition. We disagree and find no error.
The arguments that Kirkman's testimony would have been cumulative and was unnecessary are without merit. Hurd's testimony amounted to little more than bare conclusions. It gave no factually supported reasons for those conclusions. Conclusions without a factual basis are like a bridge without supporting abutments.
Similarly, Kirkman's deposition and answers given in other discovery provide little factual basis for the operating policies of BSC. The deposition, at best, discloses a very forgetful, vague witness. In a less positive sense, it suggests an arcane witness. Moreover, Kirkman's significant influence over BSC's operations strongly suggests a superior knowledge of relevant facts. See Wild v. Roman, 91 N.J. Super. 410, 414, 220 A.2d 711 (App.Div. *610 1966). Under such circumstances, there is no rational basis to support defendant's cumulative testimony argument.
Defendant also misconstrues the concept of availability where that issue relates to adverse inferences being drawn from the failure of a party to testify. The rule permitting adverse inferences to be drawn from the failure of a party to produce a witness raises a natural inference that the failing party fears exposure of those facts which would be unfavorable to him or her. See State v. Clawans, 38 N.J. 162, 171, 183 A.2d 77 (1962). The inference arises because it would be natural for a party to produce the witness. See Wild v. Roman, supra, 91 N.J. Super. at 414, 220 A.2d 711. But where a witness is equally available to both parties, the inference generally may not be drawn. Ibid.
The adverse inference rule must be viewed in a different perspective where the dereliction to produce relates to the party's own failure to testify. In that instance, it is not alone the fear of exposure to unfavorable facts that is the rationale supporting the inference. In that instance it is also a stronger, more persuasive reason for drawing an inference if the party fails to testify  the nature of a human being, the instant impulse or anxiety to countervail assertions that impugn integrity or honor. It is also not a perspective of physical equality of availability that governs but a perspective of the favorability of the testimony that can be provided. See Hickman v. Pace, 82 N.J. Super. 483, 492, 198 A.2d 123 (App.Div. 1964). Hence, where, as here, a party is present in the courtroom during trial, availability is not to be measured in terms of physical access but in terms of whether the omitted testimony would be expected to be more favorable to one party than the other. Using those concepts as guiding criteria, we conclude the trial court did not err in drawing adverse inferences from Kirkman's failure to testify.
The trial focused on the control and operation of BSC. Plaintiffs claimed Kirkman, with the concurrence of other defendants, had manipulated BSC to Kirkman's own advantage. They alleged fraud and breach of fiduciary duty by Kirkman, who was not only *611 an officer and director of BSC but a lawyer as well. Plaintiffs' contentions centered on BSC's investment policies, the PHC tax payment policy, and the dividend policy. With evidence before it that Kirkman controlled the decisions made and had superior knowledge on the reasons for those decisions, the trial court concluded, "who better  who better  than Mr. Kirkman could explain" the justification for the decisions. That conclusion is well supported by credible evidence and will not be disturbed by this court. See Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., supra, 65 N.J. at 484-85, 323 A.2d 495.

V.
The next facet of the appeal has a convoluted, confusing history. At its center are Kirkman's purchases of BSC stock from minority stockholders at prices plaintiffs claimed were below market value as a result of Kirkman's manipulation and arcane operation of BSC. That facet of plaintiff's claim resulted in the trial court ordering a buy back or proffer of sale of such stock to BSC. We reverse and remand for further proceedings on that facet.
Plaintiffs' pleadings raised issues of mismanagement, self-dealing, breach of fiduciary duty, and fraud in context of minority stockholders' derivative action and class action. The relief sought was generalized with no particular reference to rescission of the sales to persons who had sold their stock to Kirkman and no longer were stockholders when the complaint was filed. Nonetheless, the issue of rescission of those sales crept into the case.
At the close of plaintiffs' proofs, defendants, among other things, sought an involuntary dismissal of the rescission claim. See R. 4:37-2b. The trial court granted the motion. In doing so, the court found the evidence presented on the issue "deficient," it having been presented by the financial consultant who described the purchases as a "gross abuse" of Kirkman's knowledge of the true value of the shares. The court found the evidence did not "affect the class." Effectively then, the court found because the persons who sold the stock to Kirkman over the years preceding *612 the lawsuit were not members of the class and the effort by plaintiffs to assert their claims were found lacking, plaintiffs' efforts to rescind those sales had to be dismissed from the case.
Notwithstanding, the court granted rescission relief. The judgment required defendant Kirkman to give all former BSC stockholders from whom he purchased stock the opportunity to repurchase the stock at the price initially paid with interest at the rate set for prejudgment interest by court rules or, alternatively, for Kirkman to sell the stock to BSC on the same terms if the former stockholders do not purchase the stock. The trial court's opinion provided no explanation for the change. We can only guess that in the almost eighteen-month period between the close of the trial and its decision, the court overlooked the involuntary dismissal of the rescission claim.
To compound the problem, defendants made no mention of the involuntary dismissal in their initial brief. Instead, they attacked the trial court's rescission relief on substantive grounds. Then on the eve of oral argument they filed a summary disposition motion for vacation of the rescission relief afforded in the judgment. Plaintiffs challenged the motion as untimely. Oral argument encompassed a discussion of the issue  conflict between the court's in limine ruling and its judgment  untimeliness of the raising of the issue notwithstanding.
We conclude the trial court's change of heart, for whatever reason, was a nullity. The involuntary dismissal ruling took the rescission relief issue out of the case. It placed defendants, particularly Kirkman, in the posture of not having to defend the claim. Consequently, as defense counsel later pointed out to the trial court in connection with another facet of the case, defendants offered no evidence to countervail the financial consultant's opinion.
What occurred here can only be characterized as patently unfair and patently inconsistent with due process. A trial court cannot eradicate an issue from a case only to later revive it after a *613 party has relied on its eradication and not presented a defense. The trial court, by dismissing the rescission relief, established the law of the case. See generally State v. Hale, 127 N.J. Super. 407, 410-11, 317 A.2d 731 (App.Div. 1974). That law could only be changed on notice to defendants and with the opportunity for them to present evidence. In absence of that notice and opportunity, the prejudice to the defendants precluded the change made. See Blitz v. Hutchinson, 252 N.J. Super. 580, 600 A.2d 485 (App. Div. 1991).
Plaintiffs argue the trial court has the inherent power to control its judgments and, therefore, properly resolved the issue. That power does not encompass what occurred here. The court dismissed the issue from the case. That ruling had the effect of an adjudication on the merits. The court's subsequent revival is a nullity.
Nonetheless, we are satisfied the matter should not end there. While the initial ruling nullified the court's subsequent judgment relief, it does not proscribe reconsideration of the issue. Both the law of the case doctrine in this instance and the court's inherent authority provide for self-alleviation of improper rulings. See Rzepiennik v. United States Home Corp., 221 N.J. Super. 230, 236, 534 A.2d 89 (App.Div. 1987). Accordingly, while we vacate the rescission relief afforded in the judgment, we remand to the trial court for reconsideration and appropriate reopening of proofs if the court countervails its involuntary dismissal ruling. By so ruling, we find no need to rule on the substantive issues raised. Upon redetermination, either party may appeal the trial court's resolution.

VI.
We turn now to defendants' claim that the trial court erred in ordering Kirkman to repay to the corporation the PHC taxes paid for redistribution to the minority stockholders although the judgment did not provide for that redistribution. The claim and our *614 review encompass both the theory of liability and the scope of damages awarded.
Defendants claim the business judgment rule precluded Kirkman's liability. They contend the rule should sustain the directors' decision to incur the PHC taxes rather than pay dividends. Plaintiffs claim defendants' overall bad faith in management, as evidenced by the control and motivation of Kirkman that the directors obediently concurred in, prevents reliance on the rule.
The business judgment rule protects a board of directors from being questioned or second-guessed on conduct of corporate affairs except in instances of fraud, self-dealing, or unconscionable conduct. See Daloisio v. Peninsula Land Co., 43 N.J. Super. 79, 93, 127 A.2d 885 (App.Div. 1956). The rule exists to promote and protect the full and free exercise of the power of management given to the directors. 3A William M. Fletcher, Fletcher Cyclopedia of Law of Private Corporations § 1039 at 45 (perm. ed. rev. vol. 1986). So, bad judgment, without bad faith, does not ordinarily make officers individually liable. Id. at 46. The rule is a rebuttable presumption, and the burden of proof shifts to the defendant to show the intrinsic fairness of the transaction in question upon the showing of self-dealing or "other disabling factor." Id. at 58.
Decisions on dividend payments are similarly treated.
The question of whether or not a dividend is to be declared ... is exclusively a matter of business judgment for the board of directors. Courts will not interfere with such discretion unless it be first made to appear that the directors have acted ... in bad faith and for a dishonest purpose. It is for the directors to say, acting in good faith of course, when and to what extent dividends shall be declared. The minority stockholders are not in a position to question this right so long as the directors are acting in good faith.
[3A William M. Fletcher, Fletcher Cyclopedia of Law of Private Corporations, supra, § 1041.2 at 67 (footnote omitted)]
New Jersey decisional law concurs. See Casson v. Bosman, 137 N.J. Eq. 532, 535, 45 A.2d 807 (E. & A. 1946) (on the issue of dividend declaration, directors may reserve corporate profits for *615 any corporate necessity, so long as the decision is made in good faith); L.L. Constantin & Co. v. R.P. Holding Corp., 56 N.J. Super. 411, 423, 153 A.2d 378 (Ch.Div. 1959) (dividend declaration is within discretion of board of directors).
There is no dispute BSC is a personal holding company. Income of such companies is passive in that it is returned on investments and not the result of services or goods produced.
Congress enacted the personal holding company tax law in 1934. It aimed the law at wealthy persons who utilized closely controlled corporations to control their income and to take advantage of low corporate tax rates.
In Fulman, the Supreme Court described the tax:
The object of the personal holding company tax is to force corporations which are "personal holding companies" to pay in each year dividends at least equal to the corporation's undistributed personal holding company income  i.e., its adjusted income less dividends paid to the shareholders of the corporation ... thus ensuring that the taxpayers cannot escape personal taxes by accumulating income at the corporate level. This object is effectuated by imposing on a personal holding company both the ordinary income tax applicable to its operation as a corporation and a penalty tax 70% on its undistributed personal holding company income.... Since the penalty tax equals or exceeds the highest rate applicable to individual taxpayers ... it will generally be in the interest of those controlling the personal holding company to distribute all personal holding company income thereby avoiding the 70% tax at the corporate level by reducing to zero the tax base against which it is applied.
[Id., 434 U.S. at 531, 98 S.Ct. at 844, 55 L.Ed.2d at 6-7 (citations and footnotes omitted)]
From that analysis, the penalty tax alternative to payment of dividends is a "no rational basis" option to an investment type corporation like BSC absent extraordinary facts; and in the absence of such extraordinary facts, the election to pay the tax rather than dividends is cast in a negative light.
The trial court found that negative light and equated it to bad faith. It held that Kirkman, by his control of the corporation, and the directors, by abdication of their responsibilities to that control, breached their respective fiduciary duties to the stockholders. The breach emanated from Kirkman's manipulations to promote his own interests at the expense of the shareholders. The court *616 then reasoned the payment of PHC taxes effectively deprived the stockholders of dividend income "to which they were entitled by virtue of the very thrust and purpose of Section 541 of the Internal Revenue Code." The court found the PHC tax payments unnecessary as a matter of law and should have been avoided by several options available, all of which would have resulted in dividend distribution to the stockholders. Recognizing the impetus behind Congress's imposition of the tax to penalize wealthy persons' efforts to avoid taxes, the trial court also imputed to Kirkman an effort to avoid paying substantial personal income taxes on the substantial dividends that would have arisen had BSC paid dividends rather than PHC taxes. We find no basis for disturbing these conclusions. See Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., supra, 65 N.J. at 484-85, 323 A.2d 495.
Notwithstanding, defendants argue the trial court erred because the ruling rests on the assertion the PHC tax payments were necessary so BSC could retain income for investments and expansion. Yet, a review of the record discloses no significant investments or expansion that utilized all of the undistributed income. Only in 1980 did BSC purchase a major asset, a Maryland office building, and that was financed in part by borrowed funds. Some stock purchases were made in 1981, 1982, 1983, and 1987, but again there is no suggestion those stock purchases impaired dividend distribution. The record discloses no investments or loans during the period 1975 to 1979; yet, BSC paid nearly $300,000 in PHC taxes. Defendants provided no explanation why BSC had the money to pay the PHC taxes but did not have the money to pay dividends. Those facts, combined with defendants' failure  particularly Kirkman's failure  to explain the intrinsic fairness of the dividend policy and the arcane financial disclosure policy, belies defendants' need to retain argument.
Defendants also find immunity from liability for their challenged decisions in the corporate bylaws. They point to that portion of the bylaws which imposes absolute discretion in the directors to set aside from net profits such amounts for such purposes as they *617 think will be "conducive to the interest of the company." The contention not only misreads the bylaws but misconstrues governing legal principles.
The bylaws do not allow unbridled discretion  which would have to be found to condone the conduct here. The bylaws authorize "absolute discretion" to reserve and utilize funds conducive to the company's interest. Here, there was no reservation of funds. Here, to put it simply, there was a waste of assets. There also can be no reasonable conclusion that paying the PHC taxes rather than declaring dividends is conducive to the interest of BSC, particularly in light of fact that the corporation existed to provide its stockholders with income from investments.
Corporate directors owe a fiduciary duty to the stockholders. See Francis v. United Jersey Bank, 87 N.J. 15, 36, 432 A.2d 814 (1981). In an investment corporation such as this where the goal has to be to yield as much income to the stockholders as possible, it is a breach of the fiduciary duty for the directors to suppress the income yield by paying taxes instead. In a context where the clear import of the evidence is that the directors of BSC, with Kirkman at the helm, suppressed the dividends which allowed Kirkman to buy up BSC stock at low prices and which subverted the potential of investor interest that might have given rise to a challenge to Kirkman's control, we reject the premise that the bylaws gave the directors discretion to act as they did and, even if the bylaws can be read to vest such discretion, under the circumstances they would be nugatory.
In sum, we have reviewed the record in light of the recited applicable law. From that review we conclude there is credible evidence to support the trial court's conclusion that the payment of PHC taxes in the amounts paid over the period in question was motivated by unconscionable, bad faith conduct enervated by Kirkman through his control of BSC and its board of directors.
*618 We turn now to the damages awarded against Kirkman for the decision to pay PHC taxes rather than dividends. Compensatory damages serve as recompense for the loss sustained. The essential purpose is to make plaintiff whole to the extent possible. This is true whether the wrong inflicted lies in tort or contract. The goal is to restore the plaintiff to the extent possible to the same position he or she was in prior to the occurrence of the wrong. See Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 48, 477 A.2d 1224 (1984); Patusco v. Prince Macaroni, Inc., 50 N.J. 365, 368, 235 A.2d 465 (1967); McAndrew v. Mularchuk, 38 N.J. 156, 160, 183 A.2d 74 (1962); Berg v. Reaction Motors Div., 37 N.J. 396, 412, 181 A.2d 487 (1962). On occasion the uncertainty as to the amount of damages causes considerable deference be given to the trier of the facts' award. See Baxter v. Fairmount Food Co., 74 N.J. 588, 600, 379 A.2d 225 (1977); see also Tessmar v. Grosner, 23 N.J. 193, 203, 128 A.2d 467 (1957). However, where as here the damages are specifically determinable, such deference need not be afforded. Thus, when the damages are readily calculable, it is clear when the award goes beyond the goal of restoration  the goal to make the injured party whole  the award is excessive. That occurred here.
The PHC taxes paid denied all shareholders their rightful dividends. Thus, the majority stockholders, the 55% other than the class represented in this suit, were entitled to a share of the PHC taxes paid in lieu of dividends. Nevertheless, the trial court effectively awarded all of the PHC taxes paid to be distributed to the minority stockholders. That represented an award 55% in excess of the actual damage suffered. It made the class more than whole. It provided a windfall. Even a court of chancery cannot make such an award.
Accordingly, the matter is remanded to the trial court to recalculate the damage award and limit it to 45% of the total PHC taxes paid. A similar adjustment must be made on the award of interest. It must be noted, however, these recalculations may be *619 affected by the trial court's decision on the remanded rescission issue. The record discloses the 45% minority stockholders' figure does not include those who will benefit from the rescission if it is granted. Also, the trial court did not in its opinion direct whether or not the rescission beneficiaries would share in the damages. Therefore, if the trial court grants rescission and intends the rescission-beneficiaries be included in the class so as to share in the damage award, then the number of minority stockholders and therefore the class sharing in the damages will be enlarged. If the trial court grants rescission and intends the stockholders, to whom rescission is granted, be included in the damage award, then the percentage of minority stockholders must be recalculated to arrive at the appropriate damage award. Moreover, in the event of a rescission determination and there is no sale-back to the former stockholders, the trial court must decide whether BSC, if it buys back the stock as permitted, is entitled to the proportionate share of damages the rescission beneficiary minority stockholders would have received.
One final note on this issue. Our review of the record discloses that the chart set out on page 603 of this opinion, which compares the PHC taxes and dividends declared for the years in question, discloses inconsistencies with other evidence on the amount of PHC taxes paid. For example, the chart shows a figure for 1987 that matches a figure shown in the 1988 financial statement. If the parties cannot resolve the appropriate amounts, the trial court must do so, even if it requires further hearings.

VII.
Defendants claim there was no basis for the award of punitive damages. We need not tarry long on this claim because we are satisfied there is sufficient credible evidence to support the trial court's awards.
"Punitive damages are sums awarded apart from compensatory damages and are assessed when the wrongdoers' conduct is especially egregious." Leimgruber v. Claridge Assocs. *620 Ltd., 73 N.J. 450, 454, 375 A.2d 652 (1977). The decision to award such damages and the amount thereof rests in the sound discretion of the trier of fact. Id. at 456, 375 A.2d 652.
In assessing such damages, the trier of fact should take into consideration all of the circumstances surrounding the particular occurrence including the nature of the wrongdoing, the extent of harm inflicted, the intent of the party committing the act, the wealth of the perpetrator, as well as any mitigating circumstances which may operate to reduce the amount of the damages.
[Ibid.]
Moreover, appellate court review of any punitive damage award is carefully circumscribed. We may set aside an award only if it is "so excessive as irresistibly to give rise to the inference of mistake, passion, prejudice or partiality; or [is] so disproportionate as to shock the conscience; or the sustaining of the award would result in a manifest denial of justice." Id. at 459, 375 A.2d 652 (citations omitted).
Guided by these principles, we find no basis for disturbing the award. While the trial court may not have articulated the reasons for making the award, we are satisfied from our review of the record that there is credible evidence to support the amount awarded. See Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 346, 627 A.2d 1081 (1993); State v. Johnson, 42 N.J. 146, 158, 199 A.2d 809 (1964).
Accordingly, the judgment under appeal is affirmed in part and reversed in part and remanded for further proceedings consonant with this opinion. We do not retain jurisdiction.
NOTES
[1] Elwood F. Kirkman died shortly after oral argument on this appeal. We granted plaintiffs' motion to substitute the Estate of Elwood Kirkman. See R. 4:34-1.