**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1293-24

PRADEEP KHANNA and
ASHMEE KHANNA,

      Plaintiffs-Respondents,

v.

SANDEEP KALRA, GLOBAL
PROPERTIES & HOLDINGS,
LLC,

      Defendants-Appellants,

and

SANDEEP KALRA, in his
individual capacity and on behalf
of GLOBAL PROPERTIES &
HOLDINGS LLC,

      Defendant/Third-Party
      Plaintiff-Appellant,

v.

SUCHITA PERTI, RAJEEV
PERTI, GLOBAL CONSUMER
PRODUCTS t/a OVERDRIVE
LIGHTING,

Third-Party Defendants-
Respondents.

_____

Argued April 21, 2026 – Decided June 3, 2026

Before Judges Gilson, Perez Friscia and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-6624-19.

Justin A. Jacobs argued the cause for appellant Sandeep Kalra (Law Advocates LLC, attorneys; Justin A. Jacobs, of counsel and on the briefs).

Joseph Elmo Cauda, Jr., argued the cause for respondents Pradeep Khanna and Ashmee Khanna, (Schumann Hanlon Margulies, LLC, attorneys; Robert E. Margulies, of counsel; Joseph Elmo Cauda, Jr., on the brief).

Paul H. Appel argued the cause for third-party respondents Suchita Perti, Rajeev Perti, and Global Consumer Products.

PER CURIAM

Defendant Sandeep Kalra appeals from a December 9, 2024 judgment entered in favor of plaintiffs Pradeep Khanna and Ashmee Khanna and third-party defendants Suchita Perti, Rajeev Perti, and Global Consumer Products

(Products), and a March 2, 2023 order denying his cross-motion for partial summary judgment.[1]  We affirm.

I.

In September 2019, Khanna filed a complaint against defendant and Global Properties & Holdings LLC (Properties) seeking dissolution of Properties and distribution of the proceeds of the sale of its only asset, a warehouse in Clifton (the warehouse), among other claims unrelated to this appeal.  Khanna's wife, Ashmee, was later added as a plaintiff.  In response, defendant filed a counterclaim against Khanna and a third-party complaint against Rajeev, Suchita, and Products, an entity owned by Khanna, Rajeev, and Suchita.

In his counterclaim, defendant alleged Khanna misappropriated over $4.2 million from Global Clothing Network, Inc. (Clothing), a company owned by Khanna, defendant, and non-party Mickey Mehta, from November 2006 through March 2007 (the transfers claim).  Defendant also alleged Khanna improperly usurped a business opportunity by using partnership assets to fund his own

_____

[1]  Because plaintiffs share a common surname we refer to Ashmee Khanna as Ashmee for clarity.  Additionally, because Rajeev and Suchita Perti, and other individuals mentioned in this opinion, share a common surname, we refer to them as Rajeev and Suchita.  No disrespect is intended.

interest in Products (the usurped business opportunity claim). Specifically, he alleged Khanna secretly obtained a fifty-percent interest in Products by allowing it to use the warehouse rent-free and using funds he misappropriated from Clothing. Defendant additionally alleged Khanna owed him a share of the proceeds of two commercial properties previously owned by their companies Big Apple Apparel Pvt. Ltd. (Big Apple) and Global Garments Pvt. Ltd. (Garments) in India (the India real estate claim).

## II.

After the close of discovery, Khanna moved for partial summary judgment contending defendant's transfers claim was barred by the applicable six-year statute of limitations set forth in N.J.S.A. 2A:14-1(a). Defendant cross-moved for summary judgment on the transfers claim. On March 2, 2023, after hearing oral argument, the motion judge entered an order denying both motions supported by an oral opinion.

As to defendant's cross-motion, the motion judge determined:

> Even though . . . Khanna does not have any supporting documents, . . . Khanna has given his reason for the fraudulent transaction and the [c]ourt finds that it is a jury question . . . whether or not . . . Khanna has a valid response to his reasons for the alleged fraudulent transactions.

4

The motion judge also found defendant's "self-serving testimony as to his ignorance of all the finances of Clothing should not . . . go untested and his credibility is an issue that must be decided by the jury."

III.

A different judge conducted a bench trial over twenty-three non-consecutive days from September 2023, through July 2024. We summarize the relevant facts adduced at trial.

a. The Transfers Claim

Khanna, defendant, and Mehta were friends, born in India, who came to the United States and became business partners. Khanna trained as an accountant in India and later passed the certified public accountant exam in California but was never licensed as an accountant in the United States.

All three had experience working in the wholesale clothing industry in the United States. In 1989, Khanna came to the United States to work for a clothing wholesaler in Los Angeles, which was a subsidiary of North American Design Workshop (NADW), where he met Mehta. In 1990, Khanna moved to New York where he met defendant who worked at NADW's New York office.

In 1994, Mehta and defendant left NADW to join a competing company, Resist. Defendant testified they were "the first two to join and start the

5

company." Mehta was "in charge of the whole company" and defendant "handle[d] the women's division." They grew the "company in the very first year to almost [twenty] million [dollars] in revenue" and it was "a great success."

In July 1997, defendant and Mehta left Resist because "it was time to try [their] hands and try something of [their] own." They formed Clothing, a wholesale clothing company, in California.

In September 1997, defendant and Mehta asked Khanna to join Clothing. According to defendant, they asked Khanna to join Clothing because they lacked experience with managing the finances of a business and knew Khanna was trained as an accountant. According to Khanna, they approached him because "of [his] skills . . . in financial matters" and his "cash resources, [his] family money in India." Khanna testified defendant and Mehta "understood from the beginning that in addition to [his] expertise . . . [he] would make available [his] family money." The "family money" to which Khanna referred was held by Ashmee's late father, Prem Nath Perti, and late brother, Sanjeev Perti.[2]

Khanna joined Clothing as an equal partner with defendant and Mehta. Khanna's interest was held in Ashmee's name, although she performed no work

---

[2] Again, because numerous individuals share a common surname, we refer to Prem Nath Perti and Sanjeev Perti as Prem and Sanjeev. No disrespect is intended.

for the company. Mehta, as "President," was responsible for the men's and boy's clothing division. Defendant, as "Senior Vice President," was responsible for the women's clothing division. Khanna, as "Chief Financial Officer," was responsible for financial matters.

The partners operated Clothing informally. Although they met and communicated about business regularly, they did not observe corporate formalities, including conducting shareholder meetings or passing resolutions, except when necessary for purposes of interacting with banks.

Clothing's suppliers were primarily located in China, Nepal, and India. According to Khanna, from 1997 through 2004, the suppliers were not willing to extend credit to Clothing because it was an unknown entity, and the three partners were not in a position to provide cash collateral. Khanna testified Prem and Sanjeev advanced funds to Clothing from their personal account at the Bank of Baroda in India (Baroda), which funds were paid directly to the supplier factories.

In addition, during the relevant time period, Clothing's products were subject to United States government established "quotas." Quotas were government-imposed limits of certain imported goods and were necessary to clear United States Customs and Border Protection. Clothing's quotas were

7

handled by defendant because he was responsible for sourcing. A quota could be purchased from a broker, or it could be purchased directly from the supplier factories. According to Khanna, his family's money was also used to purchase quotas. The funds would be deposited into defendant's Baroda account or delivered directly to a supplier or quota broker at defendant's direction.

Khanna testified his family's money that was used to pay the supplier factories overseas and to purchase quotas did not "show up as family money in the books of Clothing because [it was] not directly received into Clothing's bank accounts . . . it was advanced on behalf of Clothing overseas." Instead, the family money that was advanced was included as accounts payable on Clothing's financial statements, which were prepared by independent accounting firms and issued every year. From 2000 through 2005, Clothing's accounts payable, as reflected on its audited financial statements, increased from $1,278,891 to $3,789,985. Khanna testified that this was due to the funds his family advanced to Clothing. In Clothing's audited financial statement as of December 31, 2006, after Khanna's family was substantially repaid, Clothing's accounts receivables decreased to $560,183.

Khanna testified defendant kept very detailed handwritten records of the funds paid to factories and the family funds that were advanced. Due to the

8

passage of time, Khanna was only able to locate a few documents that he contended established the payments by his family on behalf of Clothing. One of those documents was a worksheet dated March 31, 2001, that included defendant's handwritten notations. Khanna explained the family funds that were advanced appeared on the worksheet as entries for quotas and as advances for Clothing's sourcing activities. The worksheet included entries designated "Fabric Quota," "VEND ADV," and "PURCH ADV- USF," which Khanna explained were notations defendant used to track the funds that were advanced to Clothing by his family.

Khanna testified that from November 2006, through March 2007, he reimbursed his family for the funds that were advanced using funds from Clothing's bank account in the United States. Defendant contends Khanna transferred a total of $4,257,295.67. Khanna sent the money in over thirty separate transactions using cashier's checks and deposited the funds in Prem's HSBC bank account in India, on which Khanna was also a signatory.

Defendant denied Khanna's claim that his family advanced funds to Clothing. He testified Clothing "was profitable from the day it started" and did not need to borrow money from Khanna's family. Defendant characterized Khanna's claim that his family provided cash collateral as "a lie" and "a fiction."

A-1293-24

Defendant contended Clothing's financial records identified all of Clothing's lenders and related party transactions and there is no mention of any advances of Khanna's family money. Defendant denied that the March 31, 2001 worksheet related to funds advanced to Clothing by Khanna's family in India.

At trial, defendant called Mehta, Clothing's bookkeeper, Raghuram Mariyappa, and representatives of three of Clothing's suppliers as witnesses, all of whom testified that they were unaware of any advances of funds by Khanna's family. The suppliers also testified that Clothing did not need to give cash to factories prior to receiving goods and did not pay the factories for quotas. Defendant argued Khanna's testimony was inconsistent with his response to a United States Internal Revenue Service investigation in which he declined to answer certain questions based on his "invocation of the Fifth Amendment."

b.     The Usurped Business Opportunity Claim

In 2005, defendant, Khanna, and Mehta formed Properties and purchased the warehouse primarily for use by Clothing. Each partner held a one-third interest in Properties.

The warehouse was approximately 23,000 square feet. Khanna testified that "in 2007, because [Clothing's] sales really went down significantly, . . . [they] had a lot of vacant space, unused space." Clothing was

10

only using "between [twenty-five] and [thirty-three]" percent of the space. The warehouse was "like an open box" where everybody had access to everything. In order to lease space in the warehouse to an unknown tenant, Properties would have needed to divide the space and install separate entrances. Khanna testified leasing the unused space to an unknown tenant was economically untenable.

In 2006, Suchita and Rajeev formed Products, which marketed specialty lighting products. Rajeev and defendant were close personal friends. In 2007, Products began to use a small amount of space in the warehouse without paying rent. Khanna testified that if Products did not use the space, it would have remained vacant.

In 2008, Khanna purchased a fifty-percent interest in Products in exchange for $25,000 and his commitment to infuse more money into Products in the future. Khanna did not tell defendant or Mehta about his interest in Products.

From December 2007 through March 2008, Khanna transferred approximately $1 million from Prem's HSBC Account in India to Rajeev's bank account in the United States. From January 2008 through May 2008, Rajeev and Suchita personally loaned Products over $400,000. Defendant contends the

11

A-1293-24

funds Rajeev and Suchita loaned Products can be traced back to the funds Khanna transferred from Clothing to Prem's HSBC account in India.

From 2009 until 2013, Products paid rent in the amount of $1,500 per month for the warehouse. From 2014 through 2018, Products paid $6,000 per month in rent.

c.     The India Real Estate Claim

In 2005, defendant and Khanna decided to invest together in residential and commercial real estate in India.[3]   They purchased two commercial properties:  Big Apple purchased property known as Kundli, and Garments purchased property known as Ecotech (the commercial properties).

It is undisputed defendant and Khanna agreed they would equally invest in the commercial properties and, when the properties were sold, they would "get back the money [they each] put in, and then . . . equally split any profits" from the sales.  For reasons not relevant to this appeal, defendant's interests in Big Apple and Garments were held by Rajeev, as defendant's nominee.

At trial, defendant testified he initially transferred $100,000 to Khanna for their "joint venture" involving the purchase of residential and commercial real

---

[3]  Their investments in residential real estate are not the subject of this appeal.

A-1293-24

estate in India. Defendant also testified Khanna withdrew "2.7, 2.8 Indian [R]upees " (INR) from his bank account in India in 2009 and 2010.

In September 2015, Khanna and Rajeev sold their interests in Big Apple, and on March 20, 2017, they sold their interests in Garments. Defendant concedes he received two checks for his share of the sale of his interest in Big Apple. Khanna and Rajeev each received 14,236,225 INR from the sale of Garments and paid a brokerage fee of 759,000 INR.[4] Rajeev transferred his portion of the sales proceeds less the brokerage fee, 13,856,725 INR, to Khanna, who is holding the funds, in INR, in his bank account in India.

At trial, Khanna testified he owed defendant 2.97 Indian Crore (29,700,000 INR) "net before . . . taxes" from the sale of Garments and Big Apple "including his investment and his share of [the] gains." Khanna based his testimony, in part, on a "one page summary worksheet of . . . bank transactions between [him] and [defendant]" that they "went over . . . a few times." According to Khanna, that document, designated PKAL-31, "cover[ed] all the transactions in India . . . between [him] and [defendant]," including transactions relating to the commercial and residential properties.

---

[4] The parties stipulated the conversion rate on March 20, 2017, was 65.34 INR to $1 United States Dollar (USD).

13

On December 9, 2024, the trial judge entered the judgment supported by a thirty-three-page written opinion. Relevant to this appeal, he ordered "[t]he 29,700,000 INR is to be distributed to [defendant] from the fund held by Khanna from the India [r]eal [e]state transactions," and dismissed all other claims, counterclaims, and the third-party complaint with prejudice.

The judge recognized "[i]n many respects, the issues . . . before [him] turned on credibility." He found "Khanna to be credible" and "did not find any indication that he was attempting to mislead" him. The judge "found [defendant] to be less credible." "In general, his demeanor was not as consistent as that of Khanna and at times his body language expressed that he was seeking to have the [judge] accept a certain viewpoint as being a set of facts." He "did not find the testimony of the non-party witnesses to be credible or of any particular value to [him] in making [his] findings."

The judge found "[t]he evidence showed that the parties conducted business in a manner that did not involve exact compliance with corporate formalities." He concluded they "ran the business and operated in a way that reflected the reality of a small business" and their "functions comported with the skills that each brought to the venture." "In this way, the fact that Khanna may

have had a title of chief financial officer, [did] not in the context of this business indicate that he had a heightened, or particular, fiduciary responsibility to the parties or the businesses." Rather, "that title was an indication that within the business with the limited number of partners, Khanna's skill-set and experience warranted him addressing the financial issues–and holding that title in the event that signature by the [chief financial officer] was required by a bank or other third-party."

The judge found defendant failed to establish "that Khanna breached any fiduciary duty owed to the entities or to the members." He specifically found defendant's "testimony with respect to these issues was not credible" and his "testimony seemed more to be an attempt to have the [judge] accept a particular narrative rather than providing . . . complete and accurate information."

He also found "Khanna's actions [fell] within the business judgment rule." The judge concluded, "[i]f there was an overall finding from the extensive testimony at trial, it was this–these were serious businessmen, who engaged in and built businesses involving muti-national transactions" and "knew what their business was about." The judge found "the substance of the way that each partner conducted the part of the business for which they were responsible was

15

known and approved" and "where there ha[d] been approval, the standard that applies involves the business judgment rule."

Addressing the transfers claim, the judge found defendant "did not provide sufficient credible evidence to show that Khanna committed the torts of conversion and fraudulent concealment." He concluded while defendant "may have been more involved in design and sourcing, he was not credible in asserting that he was not aware of extensive transfers of monies." He denied defendant's claim "with respect to improper repayment of loans, capital contributions[,] and other claims of wrongdoing."

The judge dismissed defendant's usurped business opportunity claim because "[a]pplying the factors to the credible evidence at trial" he found defendant did not establish "Khanna usurped a corporate opportunity as concerns Products." He found the "business operations of Products was distinct from that of Clothing" and although "Products operated out of space at the warehouse, the credible evidence was that Clothing was not using all of the space" and "[t]he companies were not in competition with one another." The judge also determined "there was no credible evidence that any of the parties anticipated that the others would involve them in all of the various business ventures in which they were engaged."

A-1293-24

The judge rejected defendant's claim that Khanna usurped a business opportunity by allowing Products to use space in the warehouse. He found "[e]xcept for a period in 2007 and 2008, when Products occupied minimal space and did not pay any rent, Products paid rent . . . to Clothing and . . . Properties." The judge determined the "credible evidence showed that Clothing had never used the entire warehouse." "Clothing used . . . one-half of the space. As business declined, Clothing used even less than one-half of the space."

The judge concluded the "[e]vidence indicated that it would not have been economically viable to obtain approvals and permits and install the necessary fit-ups" to "lease [the] space to any entity that was not known to the parties." The judge determined "[t]here was sufficient credible evidence to support the conclusion that use of a part of the [w]arehouse by Products was appropriate and allowed the parties to receive some rental income." He found defendant's testimony "that Properties could have leased space in some fashion other than what was done in this case . . . not [to] be credible."

With respect to defendant's India real estate claim, the judge found defendant was "entitled to have the monies (29,700,000 INR), which are being held in [INR] by Khanna." The judge dismissed defendant's third-party claims against Rajeev, Suchita, and Products because it "did not find that

17                                                                A-1293-24

Khanna . . . committed the torts that [defendant] assert[ed] were aided and abetted."

V.

On appeal, defendant argues: (1) the motion judge "erred as a matter of law by denying [his] motion for partial summary judgment after rejecting Khanna's statute of limitations defense"; (2) the judge's "finding that Khanna did not owe his partners fiduciary duties should be reversed"; (3) the judge's "finding that Khanna's conduct was protected by the business judgment rule should be reversed"; (4) "judgment should be entered in favor of [defendant] on the [t]ransfers [c]laim because the evidence at trial was insufficient to meet Khanna's heavy burden of proving that the transfers were fair to Clothing"; (5) the judge "applied the wrong standard in evaluating [defendant's] [u]surped [b]usiness [o]pportunity claim"; (6) the judge's "calculation of damages for [defendant's] India [r]eal [e]state [c]laim should be reversed"; and (7) the dismissal of the third-party claims should be reversed.

VI.

Defendant's contention that the motion judge improperly denied his motion for partial summary judgment on the transfers claim lacks merit. Our review of a trial court's grant or denial of a motion for summary judgment is de

18

novo.  <u>Samolyk v. Berthe</u>, 251 N.J. 73, 78 (2022).  Like the trial court, we consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."  <u>Brill v. Guardian Life Ins. Co. of Am.</u>, 142 N.J. 520, 540 (1995).

Defendant contends the motion judge's "conclusion that [defendant] did not know about the [t]ransfers undermined Khanna's entire defense and should have resulted in the grant of summary judgment in favor of" defendant.  That contention is not convincing.

As the motion judge recognized, the issue was whether the transfers were repayments of funds Khanna's family advanced to Clothing, as claimed by Khanna, or the misappropriation of funds, as alleged by defendant.  Based on our de novo review, we are convinced the motion judge properly concluded the parties' competing claims raised genuine issues of material fact for the finder of fact.  Defendant's cross-motion for partial summary judgment was correctly denied.

VII.

We are not persuaded by defendant's argument that the trial judge improperly dismissed his transfers claim.  On an appeal from a bench trial, we

19

afford a highly deferential standard of review to the factual findings of the trial court. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84 (1974); Allstate Ins. Co. v. Northfield Med. Ctr., P.C., 228 N.J. 596, 619 (2017) ("[W]e give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions"). We do "not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Mountain Hill, L.L.C. v. Township of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (citation omitted). The trial judge's findings will not be disturbed unless they are "manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013) (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)).

After hearing "testimony from multiple witnesses" and considering the "documents and read-ins" of deposition testimony, the judge found: (1) Khanna's testimony that his family advanced money to Clothing and the transfers were initiated to repay those advanced funds was credible; (2) Khanna's testimony that defendant was aware of the advances and tracked the advances in written documents, including the March 31, 2001 worksheet, was credible; (3) defendant's testimony that he was unaware of the advances and never tracked or

recorded the advances was not credible; and (4) the testimony of Mehta, Mariyappa, and the suppliers was not credible.

We are satisfied the judge's credibility findings are supported by competent evidence in the record and are entitled to our deference. There is no basis for us to disturb his decision to dismiss defendant's transfers claim.

Defendant's claim that the judge failed to determine if the transfers were "fair to Clothing" when applying the business judgment rule is not persuasive. "The business judgment rule protects a board of directors from being questioned or second-guessed on conduct of corporate affairs except in instances of fraud, self-dealing, or unconscionable conduct." In re PSE & G S'holder Litig., 173 N.J. 258, 276-77 (2002) (quoting Maul v. Kirkman, 270 N.J. Super. 596, 614 (App. Div. 1994)).

"The business judgment rule 'is a rebuttable presumption.'" Id. at 277. (quoting Maul, 270 N.J. Super. at 614). "It places an initial burden on the person who challenges a corporate decision to demonstrate the decision-maker's self-dealing or other disabling factor." Ibid. (internal quotation marks and citation omitted). "If a challenger sustains that initial burden, then the 'presumption of the rule is [] rebutted, and the burden of proof shifts to the defendant or defendants to show that the transaction was, in fact, fair to the

corporation.'" Ibid. (quoting Stuart L. Pachman, Title 14A-Corporations at 228 (2000)).

In this case, the judge credited Khanna's testimony that the transfers represented the repayment of funds advanced to Clothing. In other words, Clothing was merely repaying amounts it owed. Defendant presented no credible evidence to show the transfers were not "fair" to Clothing.

Defendant's claim that reversal is required because the judge did not find Khanna owed him a "heightened" fiduciary duty is not convincing. It is well settled that corporate officers owe a fiduciary duty to the corporation and its shareholders. Casey v. Brennan, 344 N.J. Super. 83, 107-108 (App. Div. 2001), aff'd, 173 N.J. 177 (2002). That same standard applies to partners in a close corporation who "must deal with each other with trust, confidence[,] and good faith." Fortugno v. Hudson Manure Co., 51 N.J. Super. 482, 499 (App. Div. 1958).

Here, the judge rejected defendant's argument that Khanna owed him a "heightened" duty because Khanna held the title of chief financial officer. The judge did not, as defendant contends, "fail[] to recognize the fiduciary duties owed by Khanna to his partners." To the contrary, the judge found defendant did "not establish[] that Khanna breached any fiduciary duty owed to the entities

22

or to the members" because defendant's "testimony with respect to these issues was not credible." There is no basis for us to disturb the judge's determination that Khanna did not breach his fiduciary duties owed to defendant.

## VIII.

Defendant's claim that the judge incorrectly dismissed his usurped business opportunity claim lacks merit. Generally, "when partnership funds are used to purchase property . . . the property so acquired is presumed to be partnership property." Fortugno, 51 N.J. Super. at 497. Defendant contends the judge "applied the wrong standard" when he dismissed his claim "without considering whether Khanna used partnership assets to obtain his interest in Products." Specifically, he contends the judge did not consider that Khanna funded his interest in Products by giving Product "rent-free warehouse occupancy" and "over $1 million of Clothing's money."

Defendant's claim is not supported by the record. His claim that Khanna used "Clothing's money" to fund his interest in Products is premised on the validity of his transfers claim, which the judge rejected.

In addition, the judge rejected his claim that anything of value was transferred to Properties based on its use of the warehouse. The judge determined the warehouse space Products initially used without paying rent was

23

vacant and could not be leased to another tenant without costly renovations that Properties was unwilling to undertake. As the judge correctly determined, Product's use of the vacant warehouse space did not come at the expense of Properties or defendant, and there was no basis to find any "partnership funds" were transferred by Khanna to Products based on its use of the warehouse. The evidence at trial supported the judge's dismissal of defendant's usurped business opportunities claim.

IX.

We are unpersuaded by defendant's claim that the judge's calculation of damages for his India real estate claim should be reversed. The judge's award of damages in the amount of 29,700,000 INR was supported by competent evidence in the record.

Khanna testified that he owed defendant 2.97 Indian Crore (29,700,000 INR) "net before . . . taxes" from the sale of Garments and Big Apple "including [defendant's] investment and his share of gains." It is undisputed that Khanna owed defendant 13,856,725 INR for his share of the commercial property owned by Garments and defendant had been paid in full for his share of the property owned by Big Apple. According to Khanna, therefore, defendant was owed an additional 15,843,275 INR from his investments in the commercial properties.

24

Defendant testified that he initially invested $100,000 USD in their "joint venture" that included both the residential and commercial real estate transactions in India. The only other evidence defendant produced at trial was his bank statements that he contends show various "transfers directly to Khanna."

Defendant did not produce evidence sufficient to prove the amount of his alleged investment in the commercial properties. In fact, defendant has taken inconsistent positions in his briefs on appeal. In his opening brief, defendant claimed he is owed his initial investment of $100,000 USD, 13,856,725 INR from the sale of Garments, and 32,410,418 INR for "withdrawals from [his bank] accounts." In his reply brief, he contends he is owed "at least" 13,856,725 INR from the sale of Garments and 20,281,350 INR for his "investments" based on PKAL-31, which he testified inconsistently at trial includes "a lot of . . . transactions [that] have nothing to do with the Indian investments."

We are satisfied that the judge's damages award was supported by credible evidence in the record. Khanna testified he owed defendant 29,700,000 INR, which the judge found credible. Defendant, on the other hand, testified that he made an initial contribution of $100,000 USD toward the "joint venture" to purchase residential and commercial real estate, and provided evidence of

withdrawals from his bank account without offering any support for his claim that he was entitled to be reimbursed for the full amount of those withdrawals. Moreover, on appeal, defendant has taken different positions with respect to his claim for damages. Based on our review of the record, we do not discern any basis to disturb the judge's award of damages on defendant's India real estate claim.

Defendant's argument that the judge improperly denied his claim for prejudgment interest is without merit. The award of prejudgment interest in a breach of contract case rests in the sound discretion of the trial court. County of Essex v. First Union Nat. Bank, 186 N.J. 46, 61 (2006). There is no basis for us to find the judge erred by denying defendant's claim for prejudgment interest.

Defendant's claim that the damage award should be paid in USD instead of INR, "based on the parties' agreement," lacks merit. Defendant failed to set forth any competent evidence to support such a claim. We are satisfied the judge properly ordered that the award be paid in INR.

To the extent we have not specifically addressed any remaining arguments, including defendant's argument that the judge improperly dismissed his third-party claims, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

A-1293-24

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1293-24