780 A.2d 553 (2001)
344 N.J. Super. 83
Kathryn CASEY and Sheila Gagliano, Plaintiffs, and
Carol De Sanctis, John Everitt, and Thomas Morrissey, individually and as representative of the subclass of non-recovering shareholders, Plaintiffs-Appellants/Cross-Respondents, and
Stuart L. Pachman, as interim representative of the subclass of recovering shareholders,[1] Plaintiff-Appellant/Cross-Respondent,
v.
George B. BRENNAN; Joseph J. DiSepio; Patricia M. Keys; Frank T. Kurzawa; George E. Scharpf; Harold Smith; Amboy Bancorporation, a New Jersey corporation; and New Amboy, Inc., a New Jersey corporation, Defendants-Respondents/Cross-Appellants/Cross-Respondents, and
Jonathan Heilbrunn; Robert D. O'Donnell; and Carmen Yacuzzio, Defendants, and
Susan Hermanos, Defendant-Intervenor/Cross-Respondent/Cross-Appellant.
Kathryn Casey and Sheila Gagliano, Plaintiffs-Appellants/Cross-Respondents,
v.
George B. Brennan; Joseph J. DiSepio; Patricia M. Keys; Frank T. Kurzawa; George E. Scharpf; Harold Smith; Amboy Bancorporation, a New Jersey corporation; and New Amboy, Inc., a New Jersey corporation, Defendants-Respondents/Cross-Appellants, and
Jonathan Heilbrunn; Robert D. O'Donnell; and Carmen Yacuzzio, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 9, 2001.
Decided August 1, 2001.
*558 R. Bruce McNew (Taylor & McNew) of the Delaware Bar, admitted pro hac vice, Greenville, DE, argued the cause for appellants DeSacnctis, Everitt, and Morrissey (Rodriguez & Richards, Haddonfield and Mr. McNew, attorneys; Lisa J. Rodriguez and Mr. McNew, on the brief).
*559 David R. Strickler, Somerville, argued the cause for appellants Casey and Gagliano (Norris, McLaughlin & Marcus, attorneys; Mr. Strickler, on the brief).
Dennis T. Kearney, Morristown, argued the cause for defendants-respondents/cross-appellants (Pitney, Hardin, Kipp & Szuch, attorneys; Mr. Kearney and Helen A. Nau, on the brief).
Benjamin P. Michel, Morristown, argued the cause for cross-respondent/cross-appellant Hermanos (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; Mr. Michel, of counsel and on the brief).
Before Judges EICHEN, STEINBERG and WEISSBARD. *554 *555 *556
*557 The opinion of the court was delivered by STEINBERG, J.A.D.
These appeals were argued on the same day and are interrelated. Accordingly, for ease of disposition, we consolidate them for purposes of this opinion. The genesis of the litigation that led to these appeals is a decision by Amboy Bancorporation to address its concern that it had substantial excess capital that was not earning the same returns as its operations. It decided to address the problem through a corporate reorganization that included an election to be taxed as a Subchapter S corporation. In these appeals we are called upon to decide novel questions regarding the right of a shareholder who voted against the plan, but then cashed in his or her shares for the price offered by the corporation to subsequently challenge the method of evaluation, or the price offered; the applicability of marketability and minority discounts to the value of the stock; the applicability of a control premium to the value of the stock; and the right of a non-statutory dissenter to an award of counsel and expert fees.
Defendant Amboy National Bank's predecessor in-interest was established in 1888 in South Amboy. In order to provide greater management flexibility, Amboy Bancorporation was formed in 1984 to serve as bank holding company, a shell with one class of stock and one subsidiary, Amboy National Bank, that conducted its business in thirteen branches in Central New Jersey.[2] Transactions in Amboy stock were handled by "market-makers" instead of through public trading on a stock exchange.
In 1994 and 1995, Amboy paid a special dividend of $1.00 per share, which amounted to about $3,000,000 each year. As of June 30, 1997, Amboy had total assets of about $1,112,601,000, deposits of about $896,849,000, and shareholders' equity of about $135,208,000. Its net income was approximately $18,931,000 for 1996, and $10,467,000 for the first half of 1997. During the relevant period, Amboy had 420 shareholders.
Because Amboy was extremely successful, it generated far more profits than it needed as capital to continue its operations. In essence, Amboy was accumulating capital at a much higher rate than the growth rate of its assets. Accordingly, the return on equity was decreasing. Amboy developed a strategic plan which called for maintaining a return on equity of fifteen percent as its justification for continuing in the banking business. Eliminating excess capital would have required a special dividend of $25 to $50 million which, according to Amboy, was unheard of for community banks. Rather, a bank tries to employ *560 such capital to buy other banks. Indeed, Amboy made three unsuccessful attempts to buy other banks.
Amboy's June 1996 strategic plan set forth the goals of achieving a higher return on equity than peer banks, maintaining "a capital position consistent with the minimums established by banking regulatory requirements," and "creating a unique market niche identity." Amboy intended to remain an independent community bank. Amboy would continue to seek "appropriate" banks to purchase, notwithstanding its unsuccessful prior efforts. However, by the spring of 1997, Amboy was still accumulating capital faster than other assets.
In 1996, Congress first offered national banks the opportunity to become Subchapter S entities. Amboy retained experts to aid it in deciding whether to take advantage of the opportunity. Ultimately, Amboy's board of directors decided to pursue Subchapter S status. In order to obtain Subchapter S status, Amboy had to reduce its shareholder base to less than seventy-five qualified shareholders. It retained counsel, tax experts and a valuation expert. One of the reasons for pursuing Subchapter S status was Amboy's belief that it could not solve its excess-capital problem simply by increasing the dividend, because that would subject too much income to double taxation, once at the corporate level and again at the shareholder level.
George Scharpf, Amboy's President, Chief Executive and Chairman of the Board of Directors, attended a conference where he learned more about the effects of electing Subchapter S status. On February 28, 1997, he wrote to Robert Walters, the chairman of Bank Advisory Group, Inc. (BAG) to solicit a presentation of methods of reducing Amboy's excess capital. BAG specialized in advising community banks on valuation, reorganizations, and mergers and acquisitions. Walters made such a presentation at the April 16, 1997 Amboy board meeting.
On May 20, 1997, Scharpf sent Walters a request to "prepare an analysis of the financial effect of repurchasing twenty percent of the outstanding stock of our holding company at a price of $65 and $70 per share." Scharpf chose that price range as representing a ten to fifteen percent premium above the price for Amboy stock that market-makers were quoting at that time. However, Walters denied taking Scharpf's mention of specific figures as a signal of the result Amboy wanted. In addition, Scharpf denied that mentioning those figures to Walters was a signal that Amboy wanted BAG to opine that the value of Amboy stock was within that range. According to Scharpf, he attempted to select a price based upon what he believed "somebody else will pay me for this bank."
At the June 18, 1997 board meeting, the board authorized Scharpf to "proceed with the legal aspects" of the contemplated transaction. In August, 1997, KPMG Peat Marwick provided Amboy with an analysis of the financial, regulatory, and tax consequences of a Subchapter S election. At its August 19, 1997 meeting, the board voted to pursue a Subchapter S election, to devise a plan that would make Amboy eligible to do so, and to set $73 per share as the price for all share transactions.
On September 10, 1997, Amboy sent all shareholders notice of a forthcoming shareholder vote on a proposal to restructure Amboy to qualify for taxation as a Subchapter S status "closed corporation." The notice stated that shareholders currently owning a sufficient number of shares, estimated at 15,000, would continue to be shareholders. Those owning fewer shares would "receive cash in exchange for their shares and cease to be shareholders," *561 unless they took advantage of "the opportunity to purchase additional shares."
On September 16, 1997, Amboy and New Amboy, Inc. executed a merger agreement. New Amboy, Inc. was a shell corporation. Under the plan, Amboy would merge into it and be given the name Amboy Bancorporation. That same day, Amboy's board met and scheduled a shareholder's meeting for November 19, 1997, to vote on the plan. On September 24, 1997, the Office of the Comptroller of the Currency (the COC) approved Amboy's request for the bank to pay a $45 million dividend to the holding company for use in the merger.
On October 24, 1997, BAG gave Amboy a financial fairness opinion in which it concluded that the price of $73 per share was "fair, from a financial standpoint, to all shareholders of the Company, including those shareholders receiving the Cash Consideration...."[3] Also on October 24, 1997, Amboy sent to all share holders of record as of October 15, 1997, notice of a special meeting to vote on the plan. It enclosed a proxy statement, which shareholders were urged to mark and return so that their shares would be "voted in accordance with your wishes." The proxy statement explained that, under the proposed plan, shareholders who did not own the minimum number of shares and did not "perfect their dissenters' rights" would receive $73 in cash for each share they owned. The plan was designed to result in a maximum of fifty-five continuing shareholders. The proxy statement concluded by disclaiming all other representations about the plan or the subsequent "condition or affairs of Amboy, and urged shareholders to seek independent advice about the legal, business, and tax consequences to them of the plan.
The merger agreement was attached to the proxy statement and incorporated into it. The board approved it unanimously and recommended that the shareholders adopt it as well. Approval required the votes of two-thirds of the number of shares voted at the meeting, with each share being entitled to one vote. The proxy statement also related the board's belief that the offered price "represents a fair value of" the shares. In addition, the proxy statement said that the board had been advised by BAG, which it described as an "independent financial advisor." It further provided that BAG made a "Cash Fair Market Evaluation" as of August 15, 1997, "of approximately twenty percent of the Company Stock." In addition, the proxy statement referred to a "fairness opinion" given by BAG and its conclusion that the $73 price for all transactions was "fair from a financial point of view" to the shareholders. The fairness opinion was included in the materials sent to all shareholders, whereas the cash fair-market evaluation was available for inspection at Amboy's offices. The proxy statement concluded by declaring that the market value and investment value approaches (which were described in the statement), "as discussed above and considered in concert, clearly support the fairness of the $73 per share offer."
Plaintiffs, Kathryn Casey and Sheila Gagliano filed suit in the Chancery Division, Union County, against Amboy Bancorporation, the individuals on its board of directors, and New Amboy, Inc. They alleged that defendants misrepresented the terms of the merger and failed to offer a price that represented the statutorily mandated "fair value" to the detriment of shareholders who were required to sell *562 their shares. They sought to enjoin or rescind the merger and to obtain fair value.
Plaintiff Carol De Sanctis and plaintiff John Everitt filed a class-action complaint in the Chancery Division, Gloucester County, against Amboy Bancorporation, New Amboy, and six of the individual defendants. In their complaint, they made similar allegations about the misleading nature of the merger and the failure to offer fair value, seeking rescission on the basis that the merger represented self-dealing.
Thereafter, plaintiff Thomas Morrissey filed a class-action complaint in the Chancery Division, Union County, against the same defendants that De Sanctis and Everitt had named, making similar allegations.
The three complaints were consolidated for trial in Union County. Susan Hermanos owned enough shares to qualify as a statutory dissenter, and intervened to pursue her statutory right to "fair value." In response to the invocation by Hermanos of her statutory rights as a dissenting shareholder, Amboy filed a complaint in Union County seeking the statutorily mandated hearing to determine the "fair value" of Hermanos' shares.
At trial, Casey testified that she inherited her Amboy stock. She further said that she and Gagliano were sisters. She did not have the financial ability to buy more shares to reach the minimum number and said she was never told that Amboy or Scharpf would have loaned her funds to do so. Nevertheless, she probably would not have taken such a loan, because of the amount. However, she began to question the fairness of the offered price "[o]n the advice of her father." She voted against the plan.
Gagliano also inherited her Amboy shares. She also voted against the plan, and wanted to keep her shares as an investment. She also was unaware that Amboy or anyone on its behalf might lend her funds to buy more shares, but she would not have taken such a loan. She questioned the fairness of the $73 price after discussion with her father.
De Sanctis was a school teacher, with a bachelor's and master's degree, but had no business background. She testified that she did not read the entire proxy statement and did not understand all of the portions that she did read. She had received her Amboy stock as gifts from her parents. She voted against the plan because her parents told her that the "value being given was not fair." She also voted against the plan because she did not want to sell, and probably would have voted against it regardless of the price offered. She did not have the financial resources to buy additional shares in order to reach the minimum number required to remain as a shareholder.
Everitt is De Sanctis' brother. He also received his Amboy stock as gifts from his parents. He read the proxy statement, and on November 6, 1997, he visited Amboy's offices and spent two hours reviewing BAG's evaluation. He understood from reading it that BAG had used both a minority discount and a liquidity discount. He said that based on his review, he "seriously disagreed" with the value that BAG had found. However, he admitted that the proxy statement did not "fool" him away from his conclusions about the fairness of the offered price. He said he was aware that the stock was "$83 bid with no offers prior to the announcement of the price" which meant that although someone was willing to buy the stock at $83 a share, there were no willing sellers. He also said he consulted with Kevin Ryan of Ryan *563 Beck, a market-maker in Amboy stock that had bid $83 for Amboy stock before the proxy statement. Ryan told him that $73 per share was "ridiculous and low" and his partner Roy Beck added that the price was "nowhere near fair value."
In addition, Everitt sent a copy of the proxy statement to Dan Westlake, an expert who ran the Mergers and Acquisitions Department at Principal Securities Corp., and was formerly a governor of the Federal Reserve Board. Westlake opined that the minimum price should have been $125 per share. Westlake disagreed with much of BAG's approach, and considered the plan an example of how banks were using Subchapter S status as "an avenue to squeeze out small shareholders" in a way that Congress had not intended. Westlake also said BAG "is known as a Subchapter S Squeeze-out machine," which confirmed Everitt's impression that the plan was a bad deal. On November 7, 1997, Everitt requested a copy of Amboy's shareholder list and invited some shareholders to a meeting in November 1997, for a presentation by a law firm that he had retained.
Morrissey, a licensed broker-dealer, was a co-owner of a brokerage-dealer firm that was a market-maker for Amboy stock. The brokerage would perform its own due diligence on public information and financial information that it requests of the company, to decide what price to quote for that company's stock. Morrissey did not have access to non-public information about Amboy, or to any of its projections of future earnings.
Upon learning of the plan, Morrissey looked up "the financial history and earnings ratios" of Amboy stock and concluded that it was probably worth at least $100 per share. The only person he spoke to about the plan before the shareholder meeting was a market-maker, a person named Rob at the Ryan Beck firm.
Morrissey did not read the entire proxy statement, but he did read "the areas where the bank's offer was discussed and the relative values that they gave, the established price," as well as BAG's fairness opinion. He concluded that the price of $73 per share was not fair, because it was not a "reasonable multiple" of earnings or book value compared to other banks of Amboy's size. He wanted to know BAG's methodology, but did not see it in the proxy statement. He saw and understood the disclaimer that the proxy statement's references to other documents were not necessarily complete. He also understood that he could have gone to Amboy's offices to inspect BAG's fair market evaluation.
Morrissey opposed the plan because he thought the $73 price was not fair, and also because many shareholders would be unable to "become fully informed" about the plan in time for the vote. He had no interest in going into debt to buy enough shares to reach the minimum number, in part because that would have made Amboy's stock too large a part of his portfolio. He was not interested in selling his shares. However, he did not think minority shareholders could do anything to prevent the merger.
Everitt sent a letter to all shareholders with fewer than 15,000 shares, in which he protested the $73 offered price and the compulsion on small shareholders to sell. In that letter he also said he had retained a law firm, Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, LLP, to consider filing suit "to prevent consummation of the proposed merger." He asked shareholders who owned fewer than 15,000 shares "to share the cost of litigation." He requested each shareholder to contribute one dollar per share of Amboy stock owned to help fund the litigation. He stated that he would proceed only if he received sufficient *564 money to assist in funding the litigation. He received contributions of approximately $24,000, including one from Morrissey's company for $1,500.
On November 19, 1997, the shareholders approved the plan. Casey, Gagliano, De Sanctis, Everitt and Morrissey voted their shares against the plan. On November 20, 1997, Amboy informed the shareholders of the approval, and instructed them on how to exchange their shares for the offered price, or buy more shares at that price to reach the minimum number required to remain as a shareholder.
On December 2, 1997, the merger became effective. On December 30, 1997, Amboy elected Subchapter S status, to take effect in 1998. As a result, on January 7, 1998, Amboy sent to all of the shareholders being cashed out a check worth $73 for each share they held. Each check bore the notation "FULL AND FINAL PAYMENT $73.00 PER SHARE TO HOLDERS OF RECORD 12/2/97." Everitt cashed the check he received for his shares because he did not feel he had any alternative. De Sanctis cashed the check because she felt "[t]here was no sense in just letting [the money] sit there." She did not see anything on the check that indicated she was "releasing any rights." Morrissey also cashed his check. Casey, Gagliano, and Hermanos did not surrender their stock to Amboy; Gagliano said that she was afraid that she would lose her rights if she did.
Not surprisingly, at trial, each of the parties presented expert witnesses who gave opinions as to the value of the stock. Walters testified for defendants generally stating that BAG utilized several different approaches. BAG concluded that the cash fair market value per share as of June 30, 1997, for a minority interest of about 20% of Amboy's stock, was $69.50, although in a chart it highlighted the figure of $70 as its final opinion.
Casey and Gagliano obtained a fairness opinion and fair value report as of November 28, 1997, from FinPro Inc. It criticized BAG's use of December 31, 1996 market data, concluding that the use of older data significantly understated Amboy's value. At trial, Casey and Gagliano presented the testimony of Donald Musso, the President and owner of FinPro. He performed an acquisition valuation and ultimately agreed with BAG's acquisition-value result of $110 per share but disagreed with the twenty-five percent minority discount BAG used to reduce that result to $82.50 per share.
Hermanos retained McConnell Budd & Downs (McConnell). David Budd testified at trial as Hermanos' expert on valuing banks for acquisition. In its report, McConnell criticized BAG's use of a minority discount because it departed from the practice in the "vast majority of mergers" which was to give all shareholders equal value, "on the basis that the rights of all common shareholders are equal." Thus, it concluded that a minority discount was inappropriate because Amboy had not previously distinguished minority shareholders for any purpose. It opined that "the appropriate value" of Amboy's stock as of November 18, 1997, was $120 per share. He testified as to a number of different approaches. Under any approach he used, the value was in excess of $73 per share.
The class action plaintiffs utilized the Griffing Group (Griffing) as their expert. Griffing's founder, David Clarke, testified at trial. Griffing also used different approaches, one of which was the guideline company approach which compared Amboy to five publicly traded banks that were otherwise similar. Under the guideline company approach it valued the stock at $121.08 per share. Griffing also considered the discounted cash-flow approach. *565 Under that approach, it used Amboy's projections for asset growth and profitability to project Amboy's "available or free cash flow" for ten years, and then discounted it to a present value. Using that approach it opined that the stock was worth $117.40 per share. However, Griffing gave more weight to the guideline approach because that approach reflected the "actual trading values" of the guideline banks' stock, and ultimately concluded that Amboy's adjusted fair-market value was $120 per share.
The trial judge appointed an expert, Christopher Hargrove, to assist in determining fair value. He valued Amboy as a going concern, without a marketability or minority discount, and without a control premium. Hargrove also utilized a number of different approaches in an effort to establish value for the stock. He asserted that no matter how he tried to adjust his analysis, he kept getting a figure of $92.50, or nearly so, for price per share.
In 1992, Amboy became the mortgagee in possession of a 700-unit apartment building. At that time, the building was appraised at $8 million due to its disrepair. Amboy spent $3 million to improve it and reduced the vacancy rate to what a prospective buyer would find acceptable. Amboy foreclosed in 1995. At that time, the mortgagor owed $12 million in principal and over $4 million in interest. In conjunction with a tax appeal, the building was appraised at foreclosure as being worth between $16.5 million and $17 million. Amboy then spent another $1 million on improvements. However, under generally accepted accounting principles, Amboy continued to carry the building at its book value of $8 million because "[y]ou never write an asset back up." Amboy's goal was to sell the building. Amboy did not want to sell the building before it reached a settlement with the mortgagor, because the litigation was an "actual contingency of $2 million" that Amboy wanted to resolve first. However, Amboy also knew that one of the consequences of electing Subchapter S status was that the built-in gain on its assets, including the apartment building, would be taxed at the company level as well as the shareholder level if Amboy sold it after the end of 1997. The day after the shareholder vote, when it was definite that the merger would proceed, but still with no settlement between Amboy and the mortgagor, there was "an all-out blitz" to sell the building by the end of the year. Indeed, Amboy did sell the building in 1997 for $20.5 million, a real gain of $500,000, and a book-value gain of $9.5 to $10 million. Stanley Koreyva, Amboy's Vice President of Finance, testified that Amboy's 1997 rate of two percent for return on assets was partly due to that unusual and non-recurring $500,000 gain.
The judge rendered an oral opinion. He concluded that since the directors were also majority shareholders of Amboy, and would have benefitted from the merger, they had potential conflicts of interest with the minority shareholders. Accordingly, he imposed upon them the burden of showing that all material facts concerning the merger were fully disclosed. He concluded that a fact is material if it would alert shareholders "to be on their guard to give more careful scrutiny to the terms of the merger and to make a fully informed decision." He found that the proxy "contained omitted, misleading statements of material facts and failed to disclose all material facts ... regarding the true value and future prospects of Amboy and the true fair value of Amboy's common stock." The trial judge found that the proxy statement was materially deficient for reciting the offered price without mentioning that it was derived by applying a fifteen percent marketability discount, that the price before such a discount was $82.50 per share, and that the $82.50 figure was a *566 "minority value", derived by applying a twenty-five percent minority discount. In addition, he found the proxy statement was materially deficient for failing to explain that the offered price was "fair market value" rather than "fair value," and for failing to indicate that the figure of $73 per share was based on "stale" June 30, 1997 data, instead of September 30, 1997 data. The judge further determined that the representation that the price of $73 per share was fair to minority shareholders was "misleading, erroneous and incomplete" in light of Walters' concession that the price was not fair value. Thus, he found, "the vote of the consenting shareholders who participated in the approval of the transaction was not a fully informed shareholder's vote." However, the judge refused to impose liability on the individuals because they were not aware of the misleading and inadequate information, but merely relied upon the expertise of Walters.
In his oral opinion, the judge went through a painstaking, meticulous analysis of the testimony and opinions of the experts, and gave reasons why he accepted, in whole or in part, or rejected, in whole, or in part, the opinion of each expert. The judge then set a value of $90 per share. He entered judgment for all plaintiffs, with the exception of the dissenting shareholders who cashed out, in the amount of $90 per share, less any payments previously given to them. (The dissenting shareholders who cashed-out will be referred to as the non-recovering sub-class.) In essence, the judge concluded that those shareholders were estopped from recovery. He also awarded pre-judgment interest at the rate of five and one-half percent. He awarded Hermanos counsel fees, costs, and fees for her expert. He denied all other claims for counsel fees and expert fees. In addition, he rejected the claim for punitive damages.
In A-6756-98, plaintiffs De Sanctis, Everitt and Morrissey, on behalf of themselves, and others similarly situated, appeal seeking recovery for the non-recovering subclass; an increase in fair value; and personal liability of the individual defendants. They argue that the court erred by denying recovery to the shareholders who voted against the plan but then cashed-out and surrendered their shares to Amboy. Plaintiffs argue that the shareholders, other than the class representatives Morrissey, Everitt, and De Sanctis, did not have actual knowledge of the relevant facts to reach an informed opinion of what dollar amount per share Amboy should have offered; and that even if such knowledge could be imputed from the representatives, to the rest of the plaintiffs, it could not estop them, or even the representatives from asserting a claim against defendants, because defendants were fiduciaries. They also argue that there was no showing that any dissenting shareholders knew that surrendering their shares to collect the offered price would have the legal effect of waiving further recovery. Plaintiffs further contend that there was no delay to the merger or other detrimental reliance by Amboy. In addition, they urge that the knowledge of the class representatives should not have been imputed to the rest of the class in the absence of an agency relationship. Plaintiffs also argue that defendants waived the affirmative defense of estoppel, and the form of estoppel under Delaware law known as "acquiescence," by failing to file an answer to the consolidated class-action complaint with an answer that raised those defenses.
On the other hand, in A-6756-98, defendants cross-appeal seeking reversal of the recovery granted to the recovering subclass; a decrease in fair value, and reversal of Hermanos' fee award. Defendants *567 argue that the trial judge correctly applied estoppel to bar the claims of some members, but erred in not applying estoppel to the entire class. They argue that plaintiffs' declarations about the typicality of Morrissey, Everitt and De Sanctis as class representatives made their knowledge imputable to all shareholders, not just to those who voted against the plan because they conveyed their knowledge to all the minority shareholders before the vote on the plan. They also contend that informed shareholders who vote in favor of a corporate action are estopped from complaining about the action and from seeking an appraisal. They argue further that the votes by the majority of class members to approve the plan shifted to plaintiffs the burden of proving that their votes were uninformed. Defendants also contend in their cross-appeal that the judge erred by finding that the proxy statement was misleading. Hermanos seeks an increase in fair value.
In A-6886-98, Casey and Gagliano seek an increase in fair value and an award of counsel fees and expert fees. Defendants, on their cross-appeal, seek a decrease in fair value.
On appeal, we must give substantial deference to the factual determinations of the trial judge when they are supported by adequate, substantial and credible evidence. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty L.P. v. Township of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995). Moreover, we are not bound by the trial court's "construction of the legal principles." Lombardo v. Hoag, 269 N.J.Super. 36, 47, 634 A.2d 550 (App.Div. 1993), certif. denied, 135 N.J. 469, 640 A.2d 850 (1994).
When considering issues of first impression in New Jersey regarding corporate law, we frequently look to Delaware for guidance or assistance. Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 398, 734 A.2d 738 (1999); Pogostin v. Leighton, 216 N.J.Super. 363, 373, 523 A.2d 1078 (App.Div.), certif. denied, 108 N.J. 583, 531 A.2d 1356, cert. denied sub nom. Leighton v. Uniroyal Inc., 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987).
We first consider the question of whether all plaintiffs had standing to challenge the valuation placed upon the stock in the proxy statement. Shareholders of a New Jersey corporation who would receive shares in the company resulting from a merger that would not be traded on a national exchange, like the continuing shareholders and Hermanos, have a statutory right to dissent from the merger, N.J.S.A. 14A:11-1(1)(a)(i)(B)(x), and to receive the "fair value" of their shares, N.J.S.A. 14A:11-3(2). However, the statute by its express terms excludes those who would receive only cash for their shares, like the minority shareholders here. N.J.S.A. 14A:11-1(1)(a)(i)(B)(x). A dissenting shareholder who asserts the right to receive fair value for his or her share may, in the absence of an agreement as to fair value, serve upon the corporation a written demand that it commence an action in the Superior Court for the determination of fair value of the shares. N.J.S.A. 14A:11-7(1).
Nevertheless, even those shareholders who do not qualify as statutory dissenters still have the right to claim fair compensation for their shares in the context of a cash-out merger, as an incident of the fiduciary duty of the majority to treat the minority fairly. Dermody v. Sticco, 191 N.J.Super. 192, 194, 465 A.2d 948 (Ch. *568 Div.1983) (non-dissenting minority shareholders are entitled to be paid fair value for their interests when the corporation acquired the shares of a subsidiary in order to merge it with another wholly owned subsidiary); Berkowitz v. Power/Mate Corp., 135 N.J.Super. 36, 45, 342 A.2d 566 (Ch.Div.1975).
In our view, the dissemination of an inaccurate or misleading proxy statement in conjunction with a cash-out merger that sets forth an inadequate cash-out price is sufficient to allow non-statutory dissenters to challenge the merger, or claim fair compensation for their shares, unless otherwise precluded by some other statute, doctrine, rule or law. Thus, an allegation that the offered price is unfair is an adequate basis for inquiring into the fairness of the plan, particularly where, as here, it is bolstered by allegations that defendants' statements about the fairness of the price were misrepresentations. In these circumstances our public policy requires that shareholders be permitted to challenge the valuation even though they may not qualify as statutory dissenters. Accordingly, the judge correctly allowed all shareholders to challenge the valuation of the shares.
Ordinarily, all shareholders are entitled to be paid fair value for their shares, because of the fiduciary duty majority shareholders and directors have to treat minority shareholders fairly. The right to be treated fairly is an incident of the obligation of the directors to treat the shareholders, particularly the minority shareholders fairly and is also consistent with the restraint upon them of using their powers for their own personal advantage to the detriment of the minority shareholders.
"The concept of fairness has two basic aspects: fair dealing and fair price." Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del.1983). Fair dealing necessarily includes the "obvious duty of candor." Ibid. Corporate directors have a fiduciary relationship with the corporation, and its stockholders. Francis v. United Jersey Bank, 87 N.J. 15, 36, 432 A.2d 814 (1981); Maul v. Kirkman, 270 N.J.Super. 596, 617, 637 A.2d 928 (App.Div.1994). In light of their status as fiduciaries, our law demands of directors utmost fidelity in dealing with a corporation and its stockholders. Daloisio v. Peninsula Land Co., 43 N.J.Super. 79, 88, 127 A.2d 885 (App. Div.1956). In a suit challenging a cash-out merger, plaintiff "must allege specific acts of fraud, misrepresentation, or other items of misconduct to demonstrate the unfairness of the merger terms to the minority." Weinberger, supra, 457 A.2d at 703. Thus, "even though the ultimate burden of proof is on the majority stockholder to show by a preponderance of the evidence that the transaction is fair, it is first the burden of the plaintiff attacking the merger to demonstrate some basis for invoking the fairness obligation." Id. at 711. Again, however, once that is done, the ultimate burden of proof is imposed upon the majority shareholders to show by a preponderance of the evidence that the transaction is fair. Thus, where, as here, a shareholder claim of unfairness involves a corporate transaction in which the directors stand to realize a personal benefit by continuing as shareholders after paying the minority an unfairly low price, we have no hesitancy in concluding that the fiduciary responsibilities of the directors and of the corporation toward all shareholders impose upon them the burden of proving the transaction was not "unfair and inequitable" to plaintiffs. See, e.g., Brundage v. New Jersey Zinc Co., 48 N.J. 450, 475-76, 226 A.2d 585 (1967) (holding that where the fairness of transactions between boards having common members is challenged, the burden is upon the directors to *569 show their fairness, especially where the common director is dominating in influence or in character). Thus, defendants had the burden of proving that the cash-out price offered constituted "fair value." On the other hand, "where corporate action has been approved by an informed vote" of the minority shareholders, the burden is on the plaintiffs to show that the transaction was "unfair to the minority." Weinberger, supra, 457 A.2d at 703 (emphasis added). The majority, or the corporation, has the burden of proving that the minority was, indeed, "informed." Ibid. It satisfies that obligation by showing that it "did completely disclose all material facts relevant to the transaction." Ibid. Here, the directors had divided loyalties. They had a fiduciary duty to the minority stockholders to treat them fairly. Yet, they would profit if the price offered was inadequate since the minority shares would be acquired at a discounted price. Under these circumstances, the directors were "required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." Id. at 710. They were required to prove that the transaction was fair.
Since implied in the concept of fair dealing is the duty of candor, it follows that the directors do not properly discharge their obligations when the proxy statement is false, misleading, and inaccurate. In that context, a proxy statement must include information that "a reasonable shareholder would consider important in deciding whether to sell or retain stock." Id. at 710. It is not necessary that the omitted fact or facts from a proxy statement would have changed the shareholders' vote. Rather, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757, 766 (1976); Rosenblatt v. Getty Oil Co., 493 A.2d 929, 944 (Del.1985). The fiduciary duties of loyalty, good faith, and due care obligate directors to communicate all material information fully, fairly, and candidly to stockholders. Malone v. Brincat, 722 A.2d 5, 9 (Del. 1998).
Thus, defendants were required to disclose in the proxy statement all information which was material or germane. The trial judge found that the proxy statement was materially deficient, or misleading. The record clearly supports that conclusion, and we affirm that determination for the reasons given by the trial judge. He also found that "fair price" was "the critical consideration," and that "the recommendation to Amboy shareholders to vote for the merger on the basis that the $73 price was fair to minority shareholders" was material. The record also clearly supports those conclusions. It necessarily follows that the directors breached their duty of fair dealing with the minority shareholders and thus had the burden of proving that the price offered for the shares was fair.
We next consider plaintiffs' claim that the judge erred in determining fair value, both legally and factually, thereby depriving them of their proportionate share of Amboy's value, which, they claim, was at least the $110 per share that BAG had calculated before applying marketability and minority discounts. In granting partial summary judgment, the judge ruled that Amboy was to be valued as a going concern, and that marketability discounts, minority discounts, and control premiums were prohibited as a matter of law. He also determined that post-merger events and their effects were not to be considered, because dissenting shareholders by definition relinquish the opportunity to share in the corporation's prospects.
*570 On appeal, we need not give deference to the trial judge's determinations of what discounts or premiums the determination of fair value may include, or must exclude, since they are questions of law. Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 372-73, 734 A.2d 721 (1999); Lawson, supra, 160 N.J. at 398, 734 A.2d 738. Consequently, we review those determinations de novo. Balsamides, supra, 160 N.J. at 372, 734 A.2d 721 On the other hand, the trial judge's determination of value is given a high level of deference which will be overturned only if we conclude that the judge mistakenly exercised that discretion, since that determination is essentially factual in nature. Lawson Mardon Wheaton, Inc. v. Smith, 315 N.J.Super. 32, 54-55, 716 A.2d 550 (App.Div.1998), rev'd on other grounds, 160 N.J. 383, 734 A.2d 738 (1999).
Fair value is to be determined as of the day prior to the shareholder vote required for approval of the plan in question. N.J.S.A. 14A:11-3(3)(a). In addition, fair value "shall exclude any appreciation or depreciation resulting from the proposed action." N.J.S.A. 14A:11-3(3)(c). Fair value is not synonymous with "fair market value." Lawson, supra, 160 N.J. at 397, 734 A.2d 738 (quoting Dermody, supra, 191 N.J.Super. at 199, 465 A.2d 948). Fair market value is only a potentially "valuable corroborative tool." Ibid.
The Delaware Supreme Court has discarded the traditional "Delaware block" method of valuation, which was a weighted average of asset value, market price, earnings, and other elements of value. Weinberger, supra, 457 A.2d at 712-13. The Court elected to permit "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court, subject only to [the court's] interpretation" of the appropriate statute. Id. at 713. Thus, Weinberger recognized, as our Supreme Court has observed that, "[t]here is no inflexible test for determining fair value as `[v]aluation is an art rather than a science.'" Lawson, supra, 160 N.J. at 397, 734 A.2d 738 (citation omitted). Indeed, the experts here agreed that valuation is an art, rather than a science.
As previously noted, the judge, in granting partial summary judgment, determined that he would not consider a marketability discount, or a minority discount. "A minority discount adjusts for lack of control over the business entity." Balsamides, supra, 160 N.J. at 373, 734 A.2d 721. On the other hand, a "marketability discount adjusts for a lack of liquidity in one's interest in an entity." Ibid. "A marketability discount cannot be used unfairly by controlling or oppressing shareholders to benefit [the majority] to the detriment of the minority or oppressed shareholders." Lawson, supra, 160 N.J. at 407-08, 734 A.2d 738; accord Balsamides, supra, 160 N.J. at 378-79, 734 A.2d 721. Indeed, a marketability discount fails to give the minority shareholder the full proportionate value of the shares and tends to enrich the majority shareholder at the expense of the cashed-out dissenting shareholder. Lawson, supra, 160 N.J. at 402, 734 A.2d 738. Thus, our Supreme Court has held "that marketability discounts generally should not be applied when determining the `fair value' of dissenters' shares in a statutory appraisal action," in the absence of "extraordinary circumstances." Ibid. An example of an "extraordinary circumstance" is one in which the court "finds that the dissenting shareholder has held out in order to exploit the transaction giving rise to appraisal so as to divert value to itself that could not be made available proportionately to other shareholders." 2 ALI Principles of Corporate Governance: Analysis and Recommendations *571 § 7.22(a), cmt. e at 312 (1994).
In refusing to apply marketability discounts or minority discounts, the Delaware Supreme Court has noted that the "objective of [the statutory] appraisal is `to value the corporation itself, as distinguished from a specific fraction of its shares as they may exist in the hands of a particular shareholder.'" Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1144 (Del.1989). We agree. Thus, we conclude that the judge correctly declined to apply marketability discounts or minority discounts to the value of the shares. In addition, we perceive no reason to distinguish, for these purposes between marketability and minority discounts and, thus, also conclude that minority discounts likewise are not to be applied in a valuation proceeding.
In contrast to its prohibition of minority and marketability discounts, the Delaware Supreme Court allows consideration of control premiums. A control premium is "the added amount an investor is willing to pay for the privilege of directly influencing the corporation's affairs." Lawson, supra, 315 N.J.Super. at 67, 716 A.2d 550 (citations omitted). In Rapid-American Corp. v. Harris, 603 A.2d 796, 805-06 (Del.1992), the Delaware Supreme Court held that a control premium had to be added at the holding company level in order to ensure that minority shareholders receive their "proportionate interest in [the holding company as] a going concern." However, the court cautioned that the control premium may not be utilized as a vehicle for including the value of anticipated future effects of the merger. Id. at 807. To allow it to be so used would, in effect, allow an element of value representing expected synergies or other benefits arising from the merger, which is prohibited by statute in Delaware, Del.Code Ann. tit. 8 § 262(h) (2000). We have a similar statute, N.J.S.A. 14A:11-3(3)(c), which excludes from "fair value" any appreciation or depreciation resulting from the merger. Thus, we conclude that in a valuation proceeding a control premium should be considered in order to reflect market realities, provided it is not used as a vehicle for the impermissible purpose of including the value of anticipated future effects of the merger. Because the judge determined that a control premium was prohibited as a matter of law we are constrained to reverse and remand to permit the judge to consider what, if any, impact a control premium should have on the valuation of the stock. If necessary, an adjustment should be made to exclude from the valuation anticipated future effects of the merger.
We next consider the judge's consideration of valuation methods. The question of what standards of value are permissible to consider is one of law and is, thus, subject to de novo review. Balsamides, supra, 160 N.J. at 372-73, 734 A.2d 721. Although he recognized that acquisition valuations are widely accepted in the financial community, the judge rejected their use in this case for two reasons: 1) because they might include an element for anticipated synergies, and 2) because they would yield a corporation's "sale value" rather than its value as a continuing business. However, in Rapid-American, the Delaware Supreme Court implicitly accepted acquisition value as a means of stock valuation. Rapid-Am., supra, 603 A.2d at 807. As long as it is established that the technique relied upon is generally acceptable in the financial communities, and otherwise admissible in court, it should not be excluded automatically. Lawson, supra, 160 N.J. at 397, 734 A.2d 738. Accordingly, on remand, the judge may not reject acquisition valuations outright. However, there must be a correction *572 for synergies. N.J.S.A. 14A:11-3(3)(c) (fair value must exclude any appreciation or depreciation resulting from the proposed merger).
In addition, the judge also should have considered BAG's acquisition or "control discount" approach. Under this approach, fair value is determined for a controlling block of stock. Although that approach contained an inherent control premium, Walters testified that it did not contain an element for synergies, at least when regarded as a "majority value." It also included the types of adjustments for the differences between the comparable banks and Amboy that the judge correctly required for a valuation of Amboy as a unique company, rather than as some kind of average of its peer group. That result was $110 per share before BAG incorrectly applied the impermissible minority and marketability discounts to bring it down to $70.13 per share. We also conclude, for essentially the same reasons, that the judge erred by failing to consider FinPro's and McConnell's acquisition approaches.
We also determine that the judge erred by disregarding Griffing's guideline result on the basis that the market-price approach contained an inherent control value. For guidance, on remand, the judge should consider correcting Griffing's market-price result for the minority discount that Delaware courts have found inherent in that method. In addition, the judge's use of Griffing's and BAG's discounted-cash-flow result without correction for the inherent minority discount that it recognized in them raises the same concerns. On remand, the parties shall be given the opportunity to explore and seek to develop a methodology to correct for the inherent minority discount, and exclude the element of synergies and future benefits before applying a control premium.
In sum, on the question of valuation, we conclude that the judge erred by automatically excluding control premiums as an element of fair value, and also erred in disregarding valuations that had an inherent control premium. Accordingly, we are constrained to reverse and remand. On remand the judge must consider valuations that determine the acquisition value of Amboy as a going concern, or that, in effect, determine a sale price for Amboy as a going concern. In addition, on remand the judge may not reject automatically methods of valuation that involve a control premium. However, there must be an adjustment to exclude from control premiums anticipated synergies or other future effects of the merger. Finally, the judge must consider any method of valuation that is generally acceptable in the financial communities, and is otherwise admissible in court.
We next consider plaintiffs' contention that the judge erred in not considering the gain realized on the sale of the apartment building. To be sure, post-merger events should be considered in the determination of fair value if they are developed, adopted, and implemented before the date of the merger. Cede & Co. v. Technicolor, 684 A.2d 289, 290 (Del.1996). On the other hand, if they are speculative, they are to be excluded. There was adequate evidence in the record to support the judge's conclusion that Amboy's plans to sell the apartment building were not sufficiently definite to justify including the gain on the sale in fair value. Thus, the judge did not err in failing to consider the gain.
Finally, on the question of valuation, we consider defendants' contention that the judge erred in rounding off the result. We perceive no sound reason to allow "a rounding off." Indeed, the potential amount to be paid by defendants, if rounding off is allowed, is substantial. On *573 remand, the final figure should not be rounded off.
We next consider the contentions raised on appeal regarding the trial judge's determination as to who was entitled to recover. As previously noted, the judge ruled that the plaintiffs who did not surrender their shares after the merger to collect the offered price could recover the difference between that price and fair value, whether they had voted against the plan or for it. Even those plaintiffs who had surrendered their shares were entitled to recover if they had voted for the plan, presumably because they relied on the representations in the proxy statement about the fairness of the offered price. Casey and Gagliano were permitted to recover because they had not surrendered their shares, even though they had voted against the plan. However, those plaintiffs who had voted against the plan, but then surrendered their shares, including De Sanctis, Everitt and Morrissey, were not permitted to recover, because they presumably had not relied or had stopped relying upon the representations contained in the proxy statement. Thus, the court created subclasses for recovering and non-recovering shareholders. In essence, only those plaintiffs who had voted against the plan but then surrendered their shares, including De Sanctis, Everitt and Morrissey, were not entitled to recover.
DeSanctis, Everitt, Morrissey and the class they represent claim that the judge erred by denying recovery to the shareholders who voted against the plan but then surrendered their shares to Amboy. On the other hand, defendants claim that the court erred by granting recovery to any shareholder. As previously noted, the judge found that the proxy statement was inaccurate and misleading. The judge further determined that, even in the absence of any breach of duty, shareholders are entitled to fair compensation for their shares, which is fair value. However, the judge also concluded that if "fully informed minority shareholder[s] knowing all of the material facts regarding the merger" nonetheless acquiesced by surrendering their shares and accepting the offered price, he or she must be bound by that acceptance. That was the basis upon which the judge held that those shareholders who voted against the plan, and then cashed out, were precluded from recovery. The judge believed their voluntary acquiescence meant that they suffered no damages, because "[t]o rule otherwise ... would blur or eliminate the distinction between informed and uninformed shareholders". This is especially true for Morrissey, who was a market-maker, Everitt, who was a "knowledgeable and careful businessman who took great efforts and expense seeking out professional advice on this very topic," and De Sanctis, who relied on Everitt's advice.
"Estoppel is `an equitable doctrine, founded in the fundamental duty of fair dealing imposed by law, that prohibits a party from repudiating a previously taken position when another party has relied on that position to his detriment.'"[4]Casamasino v. City of Jersey City, 158 N.J. *574 333, 354, 730 A.2d 287 (1999) (quoting State v. Kouvatas, 292 N.J.Super. 417, 425, 678 A.2d 1178 (App.Div.1996)).
The doctrine of equitable estoppel is applied only in very compelling circumstances. Davin L.L.C. v. Daham, 329 N.J.Super. 54, 67, 746 A.2d 1034 (App. Div.2000) (quoting Palatine I v. Planning Bd., 133 N.J. 546, 560, 628 A.2d 321 (1993)). The doctrine is founded on the fundamental principles of justice and good conscience, and is invoked in order to accomplish equity. Ibid. The burden of proof of a claim based upon principles of equitable estoppel is on the party asserting estoppel. Ibid. (citing Miller v. Miller, 97 N.J. 154, 163, 478 A.2d 351 (1984)). The Delaware Supreme Court has held that "when an informed minority shareholder either votes in favor of the merger, or ... accepts the benefits of the transaction, he or she cannot therefore attack its fairness." Bershad v. Curtiss-Wright Corp., 535 A.2d 840, 841 (Del.1987). However, in Bershad the shareholder was informed. Here, we have already concluded that the proxy statement was misleading and inaccurate. Consequently, the minority shareholders were not informed. Therefore, neither Bershad nor the doctrine of estoppel compels a conclusion that the shareholders were not entitled to recover. Estoppel is an equitable doctrine and it would be inequitable to permit the directors who failed in their fiduciary obligations to the shareholders by issuing a false or misleading proxy statement to hide behind the doctrine of estoppel in order to prevent the minority shareholders from acquiring fair value for their shares in this merger.
Related to the doctrine of estoppel is the doctrine of acquiescence. Kahn v. Household Acquisition Corp., 591 A.2d 166, 176 (Del.1991). By way of explanation, estoppel is the effect of the voluntary conduct of a party, here, the stockholders, which precludes them from asserting rights that might otherwise have existed, against another person, here defendants, who had in good faith relied upon such conduct, and, were led thereby to change their position for the worse. Ibid. On the other hand, the doctrine of acquiescence focuses on the conduct of a stockholder in sitting by or acquiescing in the wrongful conduct of the corporation which, may, under certain circumstances, preclude the shareholders from obtaining remedies to which they otherwise might have been entitled. Ibid. Thus, acquiescence on the part of a shareholder who tenders shares and accepts the benefits of the transaction, even though the corporation breaches a duty owed to the shareholder, may serve to bar that shareholder's right to equitable relief. Id. at 177 (citing Trounstine v. Remington Rand, Inc., 194 A. 95, 99 (Del.Ch.1937)).
Under the circumstances here presented, we conclude that voting for the plan, or cashing in the shares, does not constitute acquiescence in the director's failure to discharge their fiduciary duty. Bershad held that the minority shareholders who either voted in favor of the merger, or accepted the benefits of the transaction, cannot thereafter attack its fairness. However, in Bershad the minority shareholders were "informed." Bershad, supra, 535 A.2d at 848. Here, unlike Bershad, the minority stockholders were misled by an inaccurate, misleading proxy statement and therefore did not exercise an informed choice. Thus, since the doctrine of acquiescence is an equitable doctrine, it cannot fairly be applied to bar the minority stockholders from recovering simply because they voted in favor of the merger, or accepted the benefits of the transaction by cashing in their stock. This decision comports with our strong public policy of imposing upon the corporation, *575 and its directors, a fiduciary duty of disclosure. To allow them to breach that duty, and defeat the claims of the stockholders, would dilute that public policy. Accordingly, we reject the contention.
We next consider defendants' contentions that the knowledge of Morrissey and Everitt should be imputed to the class, and their further contention that Everitt's knowledge should be imputed to all plaintiffs because of a letter he mailed to them, in early November,[5] explaining the Subchapter S transaction, offering his view, backed by expert advice, that the merger was unfair to minority shareholders, and soliciting donations for a litigation fund. We reject those contentions. Neither New Jersey nor Delaware has specifically addressed whether the corporation's duty of full and accurate disclosure requires it to be the source of information that makes the shareholders sufficiently informed, or whether the corporation may rely on outside information that the shareholders happen to receive or obtain on their own as curing what otherwise would be a material deficiency in the information it provided, or at least as putting them on notice that the corporation's material might be unreliable. We believe our strong commitment to assuring complete candor and fair dealing with minority stockholders compels a conclusion that the corporation may not rely upon knowledge obtained by some minority stockholders regarding the unreliability of the proxy statement, even though the stockholders may have passed that information onto all stockholders. To hold otherwise might deter minority stockholders from becoming informed on their own. In addition, a contrary holding could dissuade minority stockholders from seeking to marshal support from the other stockholders.
The mere fact that the stockholders become aware of the views of others regarding the inadequacy of the proposal should not prevent them from recovery. Rather, the stockholders are entitled to rely on the explanation of the transaction by the directors, and if the directors treat them unfairly the stockholders are entitled to recover notwithstanding the knowledge they may have acquired from other minority stockholders. The fiduciary obligation is primary and direct, and the corporation may not avoid liability simply because some of the stockholders, by virtue of their background or the knowledge they acquired, were aware, or strongly suspected, that the proposed merger was not fair to them. A contrary holding would undermine our strong public policy of making corporations ensure the essential fairness to all shareholders of corporate action. Stockholders have the right to rely on representations made in a proxy statement by the directors and should not be estopped by statements made in opposition to the proposal made by other stockholders who may be perceived as merely disgruntled members of the minority.
We also conclude that the judge erred in denying recovery to De Sanctis, Everitt, and Morrissey because they had sufficient independent knowledge to determine that the price offered was inadequate. To hold otherwise would also undermine our strong public policy requiring directors to treat minority shareholders fairly. A corporation whose directors breach that duty cannot avoid responsibility to a minority shareholder who independently determined that the price offered was inadequate *576 yet after unsuccessfully voting against the proposal cashed out his or her shares at the offered price, which was inadequate. A contrary holding would reward a corporation that has breached its duty of treating minority shareholders fairly, at the expense of the minority shareholder or shareholders who have suffered damages as a result of that breach. Indeed to deny recovery to De Sanctis, Everitt, and Morrissey would have the effect of punishing them for their diligence, and would deter minority shareholders from seeking to acquire information and determine whether to oppose the plan. Since we have previously concluded that the obligation of the directors to fully inform the stockholders is primary and direct, we conclude that De Sanctis, Everitt, and Morrissey are also entitled to recover.
We next consider plaintiffs' contention that the judge erred in dismissing their claims against the individual defendants.[6] They argue that directors are insulated from liability only if they relied on advice from an attorney or a public accountant, that Walters was not an independent public accountant or certified public accountant, and that Amboy's counsel did not review BAG's work. They also argue that Scharpf's extensive knowledge about Amboy's business and his acknowledged arrival at an opinion of "what the stock was worth" independent of BAG's work precluded such reliance. The judge held that since the individual defendants had relied on BAG's and Walters' expertise, and did not have actual knowledge of the deficiency in BAG's work, they were not individually liable. The judge also determined that Walters independently arrived at his figure without being "signaled" by Scharpf, a finding that was influenced to a great extent, by his assessment of the credibility of the witnesses. Those findings are entitled to considerable deference.
Directors must "discharge their duties in good faith and with that degree of diligence, care and skill which ordinarily prudent people would exercise under similar circumstances in like positions." N.J.S.A. 14A:6-14(1). The statute also provides "safe harbors" that are deemed to satisfy that standard. Thus, in discharging their duties, directors are not individually liable if acting in good faith, they rely upon "the opinion of counsel for the corporation," N.J.S.A. 14A:6-14(2)(a), or "upon written reports setting forth financial data concerning the corporation and prepared by an independent public accountant or certified public accountant or firm of such accountants," N.J.S.A. 14A:6-14(2)(b).
The degree to which the individual defendants discharge their duties is a factual determination. There was substantial credible evidence in the record to support the judge's conclusions and we will not interfere. R. 2:11-3(e)(1)(A); Rova Farms, supra, 65 N.J. at 483-84, 323 A.2d 495. Thus, we reject plaintiff's contentions that the judge erred in not imposing liability upon the individual defendants.
We now turn to the contentions of the parties regarding the award of counsel fees and costs. The judge awarded counsel fees and expert fees to Hermanos, because she qualified as a statutory dissenter, and denied them to Casey and Gagliano, because they did not qualify. We agree with those conclusions. Casey and Gagliano claim that the judge erred by denying them counsel fees as statutory dissenters. They argue that the statutory exclusion of shareholders being cashed out cannot apply when there are other shareholders who would receive new stock instead of being cashed out, such as Hermanos, *577 and that applying the statute in that manner is contrary to the policy of affording minority shareholders equal treatment. We reject that contention.
Once the dissent process is begun, the statutory procedure includes a requirement that the corporation offer to pay the dissenter "a specified price deemed by such corporation to be the fair value" of his or her shares. N.J.S.A. 14A:11-6(2). If the corporation does not make an offer or does not make one in "good faith," the court in its discretion may award the dissenter counsel and expert fees. N.J.S.A. 14A:11-10. However, the statute only permits an award of counsel fees to one who qualifies as a statutory dissenter. Ibid.
Defendants claim that the court erred by awarding Hermanos counsel fees and costs as a statutory dissenter. They argue that Hermanos admitted that they had followed the statutory procedure for responding to dissenters, in particular by offering in good-faith to pay her $73 per share.[7]
"New Jersey has a strong policy disfavoring shifting of attorneys' fees". North Bergen Rex Transp. v. Trailer Leasing Co., 158 N.J. 561, 569, 730 A.2d 843 (1999) (citing McGuire v. City of Jersey City, 125 N.J. 310, 326, 593 A.2d 309 (1991)). That public policy is premised upon a determination that "`sound judicial administration is best advanced if litigant's bear their own counsel fees.'" Ibid. (quoting Dep't of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 504, 468 A.2d 150 (1983)). Thus, we generally adhere "to the so-called `American Rule,'" which denies the prevailing litigant the right "to collect a reasonable attorney's `fee from the loser.'" Ibid. (citations omitted). Stated another way, in the absence of a statute or rule authorizing an award of counsel fees each party bears his or her own legal expenses.
As previously noted, not all shareholders who oppose a corporate transaction and choose to sell their shares back to the corporation qualify as statutory dissenters because the statute contains exemptions. The relevant exemption here covers a shareholder who will receive cash alone in exchange for his or her shares under the plan of merger or consolidation. N.J.S.A. 14A:11-1(1)(a)(i)(B)(x). This provision covered Casey and Gagliano because they would be cashed-out under the plan as shareholders since they had fewer than 15,000 shares and had no intention or prospect of buying more. Since Hermanos would not be cashed-out under the plan, she qualified as a statutory dissenter, while Casey and Gagliano did not since they were to receive only cash under the plan. Ibid.
In considering whether Hermanos, Casey, and Gagliano had a statutory right to an award of counsel fees and costs, the only relevant statutes are N.J.S.A. 14A:11-1(1)(a)(i)(B)(x), N.J.S.A. 14A:11-6(2), and N.J.S.A. 14A:11-10. We have earlier pointed out that since Casey and Gagliano were to receive cash alone under the plan in exchange for their shares, they do not qualify as statutory dissenters.[8] The judge found that defendants breached their fiduciary duties by representing the offered price to be fair value. Simply repeating that offer to Hermanos was an equivalent breach of the fiduciary duty and therefore could not have demonstrated good faith. Thus, the judge correctly concluded *578 that Hermanos, who qualified as a statutory dissenter, was entitled to an award of counsel and expert fees. N.J.S.A. 14A:11-10.[9]
We next consider Casey and Gagliano's contention that they are entitled to enjoy the status of statutory dissenters, and are therefore entitled to an award of fees. Under the merger plan, Casey and Gagliano were only entitled to receive cash for their shares. Accordingly, they did not qualify as statutory dissenters. N.J.S.A. 14A:11-1(1)(a)(i)(B)(x). Casey and Gagliano contend that as shareholders with less than fifteen thousand shares, they were offered a choice between receiving New Amboy stock or cash. They argue that since they were offered a choice between cashing-out or purchasing such additional shares as to meet the required ownership minimum of 15,000 shares, they do not fit within the statutory exception as receiving only cash. In essence, they contend that the statutory exception for cashed-out shareholders applies only to transactions in which all shareholders are being cashed-out, but not transactions in which some shareholders are permitted to purchase additional shares and remain and receive shares of the new corporation. The judge correctly rejected that contention. In our view, the statute is clear and unambiguous. A stockholder who receives only cash for his or her shares does not qualify as a statutory dissenter, and thus cannot look to the statute as the basis for an award of counsel and expert fees. When the statutory language is clear and unambiguous, there is no room for judicial interpretation or resort to rules of construction or extrinsic matters. Vreeland v. Byrne, 72 N.J. 292, 302, 370 A.2d 825 (1977). Nor, under those circumstances may we "indulge in any interpretation other than that called for by the expressed words set forth." Duke Power Co. v. Patten, 20 N.J. 42, 49, 118 A.2d 529 (1955) (citations omitted). If the language of the statute is plain, the sole function of the court is to enforce it according to its terms. Sheeran v. Nationwide Mut. Ins. Co., Inc., 80 N.J. 548, 556, 404 A.2d 625 (1979). While there may be an inconsistency in awarding counsel and expert fees to Hermanos, while denying them to Casey and Gagliano, we lack the authority to remedy the apparent inconsistency. It is our duty to interpret a statute as written, not to legislate. In re Sussex County Mun. Util. Auth., 198 N.J.Super. 214, 218, 486 A.2d 932 (App.Div.) certif. denied, 101 N.J. 267, 501 A.2d 934 (1985). Any change in the statutory language must be made by the Legislature.
Here, the proxy statement explained that Amboy had the opportunity to qualify for Subchapter S status if it reduced its shareholders to less than seventy-five. It also set forth the plan to cash-out at $73 per share, and explained the purchase right afforded to each which allowed them to buy stock at the same price to reach ownership of 15,000 shares or the minimum ownership requirement finally determined, if they desired. The purchase option contained in the proxy statement merely served as a method by which shareholders could avail themselves of the additional or alternative right to purchase sufficient shares to meet the minimum requirement and not be required to cash-out. If they did not exercise that right, their only option was to receive cash. Since Gagliano and Casey only had the right to receive cash if they did not purchase additional shares they were not statutory *579 dissenters. In light of that fact, they were not entitled to an award of fees for counsel and experts.[10]
To the extent we have not specifically addressed any contentions of the parties, we have found them to be without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).
Affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.
NOTES
[1] Appointed between trial and judgment, when the subclasses were created.
[2] Absent a need to differentiate, the various entities involved in this litigation will be referred to simply as Amboy.
[3] Although Amboy's valuation expert considered that the share value was $69.50 per share, Amboy's board increased the value to $73 for cash out purposes.
[4] We note that plaintiffs correctly contend that estoppel is an affirmative defense that must be specifically asserted in a responsive pleading. R. 4:5-4. Ordinarily, the failure to assert an affirmative defense in a responsive pleading constitutes a waiver. Fees v. Trow, 105 N.J. 330, 335, 521 A.2d 824 (1987). Moreover, defendants did not provide the separate supporting statement of facts that R. 4:5-4 requires for affirmative defenses. However, since defendants' claims at trial were in the nature of estoppel, and plaintiffs did not then, and do not now, claim surprise, for the sake of completeness we elect to consider the contention.
[5] Although the letter is dated November 24, Everitt testified that he mailed the letter in early November. He attributed the November 24 date to his computer program, which placed on the copy the date the letter was retrieved, rather than the date it was prepared.
[6] This issue is not briefed by Casey and Gagliano.
[7] They make no argument about the amount of the award to Hermanos or its calculation.
[8] A corporation may provide in its certificate of incorporation a right of dissent in situations where it is not statutorily mandated, N.J.S.A. 14A:11-1(4), but there is no assertion here that Amboy's certificate contained any such provision.
[9] We recognize that the judge erred when he concluded that defendants had not made Hermanos a post-dissent offer for her shares. However, in light of our conclusion that the offer of $73 per share was not made in good faith, that error is of no consequence.
[10] We also note that R. 4:42-9 which authorizes an award of counsel fees in certain specified instances does not allow an award of counsel fees to a litigant who successfully opposes a corporate transaction.